STATE OF MISSOURI, at the relation of BAYLIS T. GORDON, Relator, v. CHARLES U. BECKER, Secretary of State of Missouri.—49 S. W. (2d) 146.

Court En Banc, April 1, 1932.

1054

*John I. Williamson, Emmett J. Crouse, Floyd E. Jacobs, Langdon R. Jones, Aubrey R. Hammett, Fred L. Williams, John T. Barker* and *Charles M. Howell* for relator.

1056

*Stratton Shartel*, Attorney-General, *Ray Weightman*, Assistant Attorney-General, *George C. Willson, David M. Proctor* and *Lieutellus Cunningham* for respondent.

RAGLAND, J.—This is an original proceeding in mandamus by relator, Baylis T. Gordon, to compel the Secretary of State to receive and file in his office relator's written declaration of his intention to become a candidate in the primary election to be held August 2, 1932, for the office of State Senator from the Third senatorial district of Missouri, composed of the counties of Clay, Platte, Clinton, Dekalb, Andrew and Holt, as made and promulgated August 6, 1901, and as set forth in Section 11269, Revised Statutes 1929, and to certify relator's name as such candidate to the county clerk of each county in said district. Respondent refuses to receive and file relator's declaration, on two grounds, as disclosed by his return to our alternative writ: First, that there no longer exists in this State a senatorial district composed of the counties of Clay, Platte, Clinton, Dekalb, Andrew and Holt, that the districting Act of 1901 has been superseded by an act of the Governor, Secretary of State and Attorney-General, promulgated July 14, 1931, redistricting the State pursuant to Section 7, Article IV of the Constitution,—this notwithstanding that this court had previously ruled that the power to redistrict the State had been withdrawn from the officers just named by an amendment of the Constitution; and, second, that the districting Act of 1901, even if valid at the time of its promulgation, has become unconstitutional through the lapse of time.

I. The first contention calls for a reconsideration of the ruling in State ex rel. Lashly v. Becker, 290 Mo. 560. Three sections of Article IV of the Constitution are directly involved:

"Section 1. The legislative power, subject to the limitations herein contained, shall be vested in a Senate and House of Representatives, to be styled 'The General Assembly of the State of Missouri.' "

"Section 7. Senators and Representatives shall be chosen according to the rule of apportionment established in this Constitution, until the next decennial census by the United States shall have been taken, and the result thereof as to this State ascertained, when the apportionment shall be revised and adjusted on the basis of that census, and every ten years thereafter upon the basis of the United States census; . . . such apportionment to be made at the first session of the General Assembly after each such census: *Provided*, That if at any time, or from any cause, the General Assembly shall fail or refuse to district the State for Senators, as required in this section, it shall be the duty of the Governor, Secretary of State and Attorney-General, within thirty days after the adjournment of the General Assembly on which such duty devolved, to perform said duty, and to file in the office of the Secretary of State a full statement of the districts formed by them, including the names of the counties embraced in each district, and the numbers thereof; said statement to be signed by them, and attested by the Great Seal of the State, and upon the proclamation of the Governor, the same shall be as binding and effectual as if done by the General Assembly."

"Section 57. The legislative authority of the State shall be vested in a legislative assembly, consisting of a senate and house of representatives, but the people reserve to themselves power to propose laws and amendments to the Constitution, and to enact or reject the same at the polls, independent of the legislative assembly, and also reserve power at their own option to approve or reject at the polls any act of the legislative assembly. . . . Referendum petitions shall be filed with the Secretary of State not more than ninety days after the final adjournment of the session of the legislative assembly which passed the bill on which the referendum is demanded. . . ."

Sections 1 and 7 are part of the Constitution as originally adopted in 1875. Section 57 is commonly known as the initiative and referendum amendment and was adopted in 1908. In the Lashly case it was ruled that upon the adoption of the initiative and referendum amendment the proviso of Section 7 was by necessary implication repealed. Will that ruling bear the scrutiny of a re-examination? That is the question respondent propounds to us.

All the sovereign power of this State, except the portion delegated to the general government, rests with the people of the State. They may at their pleasure grant or withhold such power, or having granted it to the agencies which they have set up for their own government, they may withdraw all or any part of it, through the medium of their organic law. By Section 1 above they granted the legislative power to the General Assembly, subject to the limitations contained in the Constitution. The grant would have been no broader had the words, "subject to the limitations herein contained," been

omitted. Because broadly speaking all the parts of state constitutions, following the general grants of powers to certain state agencies which they create, are but limitations upon those powers, directly or indirectly. [Hamilton v. County Court, 15 Mo. 13; People v. Draper, 15 N. Y. 532; 1 Cooley's Const. Limitation (8 Ed.) 61.] And so the general grant of the legislative authority of the State found in said Section 57 is likewise subject to all the limitations, express or implied, contained in the Constitution; to hold otherwise would be to affirm that the amendment of 1908 repealed practically the whole of the Constitution as it then stood, which of course is unthinkable.

One of the limitations upon the legislative power with which said Section 1 invests the General Assembly is found in Section 5 of Article IV and said Section 7. The former provides that the State shall be divided into (34) convenient districts, as nearly equal in population as may be, the same to be ascertained by the last decennial census taken by the United States; the latter that the appointionment for senators shall be revised and adjusted every ten years upon the basis of the United States census, "such apportionment to be made at the first session of the General Assembly after each such census." Under these sections (prior to the adoption of the Amendment of 1908) the General Assembly was required to make the apportionment in the manner and at the time prescribed; if it failed to do so, its power in the premises was at an end. [See State ex rel. v. Patterson, 229 Mo. 364, 373.] Following these limitations upon the legislative power conferred upon the General Assembly, there was a grant over; if that body failed to make apportionment at its first session after a census, the Governor, Secretary of State and Attorney-General were given the power to perform that act. Said Section 7 therefore contained both a limitation on legislative power and a grant of legislative power. (That the grant itself may be regarded as operating indirectly as a limitation is unimportant.) Its essential character was not affected because cast in the form of a proviso. "The word (provided) may be used in the conjunctive sense and precede an independent out-and-out grant of power." [Atwood, J., in Castilo v. Commission, 312 Mo. 244, 269.] It was clearly so used in said Section 7. It thus appears that the Constitution as originally adopted invested the General Assembly with the power to redistrict the State senatorially, subject to clearly defined limitations; it also by said Section 7 conferred upon the three state officers the specific power to redistrict, but to be exercised by them only in the contingency that the General Assembly failed at the time prescribed to exercise the power given it for that purpose.

The legislative acts that the people intended to subject to the referendum through their adoption of said Section 57 are next to be considered. The language of the section leaves no doubt about it:

"the people reserve to themselves . . . power at their own option to approve or reject at the polls *any act of the legislative assembly.*" Nor is there any question as to what is meant by the "legislative assembly:" "A legislative assembly consisting of a senate and house of representatives." Further on in the section it is provided: "Referendum petitions shall be filed with the Secretary of State not more than ninety days after the final adjournment of the session of the *legislative assembly which passed the bill on which the referendum is demanded.*" Very clearly the legislative act of a governor, secretary of state and attorney general does not fall within these referendum provisions. It follows that if the proviso of said Section 7 is still alive and subsisting part of the Constitution the act of the three state officers therein named in districting the state senatorially is not subject to the referendum.

Did the people in adopting the Amendment of 1908 intend to make all legislative acts affecting the State as a whole, including the acts making apportionment of the State for the election of senators, subject to the referendum? The language, "The legislative authority of the State shall be vested in a legislative assembly, consisting of a senate and house of representatives" was used for some purpose; it cannot be disposed of by saying that the framers of the amendment blindly copied it from the Constitution of Oregon, wholly disregarding the existing provisions of our own Constitution. A rule of construction which is greatly stressed by respondent is that all and every part of a written constitution must be given effect. Certainly the portion of Section 57 just quoted was not intended to merely repeat or confirm the grant of legislative power contained in said Section 1—a vain and useless thing. There could reasonably have been but one purpose which it could subserve, namely, to recall all the legislative authority of the State which had theretofore been granted, including both that which had been vested in the General Assembly and that which had been given the three state officers to establish senatorial districts, in order that the whole of the power then to be granted could be made subject to the reservations relating to the initiative and referendum. "*The* legislative authority of the State" means all of it: all of it is taken back by the people and then granted, subject to the reservations named, to the General Assembly alone. Manifestly the framers of the Amendment of 1908 intended, as did the people in adopting it, that every vestige of legislative power granted directly by the Constitution itself to agencies of the state government, the exercise of which would affect the State as a whole, should be subject to its initiative and referendum provisions. It is obvious, however, that the legislative power conferred upon various agencies to be used solely for local regulation or local government has not been disturbed by the Amendment. This because the machinery it

provides for submission of legislative acts to the initiative and referendum contemplates that in every instance there will be a vote of the people of the whole State in the exercise of those reserved powers. The authority with which the county courts and the circuit courts have respectively been invested by Sections 3 and 6 of Article IV of the Constitution has not therefore been affected by the Amendment of 1908.

It has been suggested that, while the Amendment of 1908 withdraws all legislative power theretofore granted subject to the limitations contained in the Constitution, in order to vest it in the General Assembly alone subject to the same limitation and in addition the reservations concerning the initiative and referendum, yet the limitation that the General Assembly shall district the State senatorially at its first session after each United States census, being a specific limitation upon a specific power, falls with the power to which it alone is applicable. With this limitation eliminated, it would follow that it is the duty of the Legislature, or the people, to redistrict the State for the election of senators (just once and upon the basis of the census) after each United States census, and that such duty is a continuing one which can be discharged only by performance. With these views we are in accord and we would unhesitatingly so hold, if in the decision of this case it was necessary for us to pass judgment on them  There will be no reason for regarding the decision which we are now about to hand down as making impossible a redistricting of the State for the election of senators for another decade and until after the next census.

In this brief discussion it has been assumed that the apportionment of the State into districts for the election of senators is a legislative act, whether done by the General Assembly or by designated state officers. That the performance of that act calls for the exercise of legislative power is no longer open to question. [State ex rel. Carroll v. Becker, 45 S. W. (2d) 533.] Respondent's counsel concede as much.

The constitutional construction suggested in the foregoing is in all essential respects the one announced in State ex rel. Lashly v. Becker, supra. We regard that construction as sound and reaffirm it.

Even if a majority of the present members of this court held views not in accord with the conclusions reached in the Lashly case, we would be loathe to now overturn that decision. It was supposed to have finally settled the construction of a provision of the Constitution which goes to the very frame of the State government. Since its rendition the personnel of the court has completely changed. Shall the stability of so vital a part of the organic law be dependent upon the personal views of the judges who happen to be members of the court at the end of each decade?

"The stability of this fundamental law requires that when the meaning of a constitutional provision has been considered by the court and declared by its decisions, that meaning cannot be afterward considered open to question or further argument. . . . The Constitution does not change with the judges. The court is the same though the judges change, and it will not overturn a deliberate decision upon the constitutional power of the Legislature under which the highest political rights have been held and exercised without question for many years." [Scown v. Czarnecki, 264 Ill. 305, 329-30. See also People v. Alturas County, 6 Idaho, 416.]

It should be further noted that the people of the State have not only acquiesced in the construction of the Constitution effected through the decision in the Lashly case, but have impliedly given it their approval. Among other amendments proposed by the Constitutional Convention of Missouri, 1922-1923, and submitted for adoption at a special election held February 26, 1924, was one which amended said Section 7. It provided:

"Such apportionment shall be made by the Governor, Secretary of State, Attorney-General, State Auditor and State Treasurer, or a majority of them, within sixty days after the result of such census has been ascertained.

"Such officers shall file in the office of the Secretary of State a full statement signed by them or a majority of them containing the districts, their numbers, and the names of the counties in each. Upon the filing of such statement the new districting shall be in full force and effect.

"The acts of such officers shall be ministerial and mandatory and shall not be subject to the referendum and failure to perform shall be cause for impeachment, and neglect or refusal or failure to properly perform within the time herein prescribed shall not discharge such officers of such duty but the same shall continue until fully performed." [Missouri Manual, 1923-1924, p. 523.]

The proposed amendment was overwhelmingly defeated at the polls. The action of the people in rejecting it very clearly indicated that they desired the power to district the State for the election of senators to remain with the Legislature and be subject to the referendum.

II. We do not take this contention of respondent seriously. He argues that within the contemplation of said Section 7 every act making an apportionment of the State for the election of senators expires by limitation at the end of ten years. It is true that it is made the duty of the Legislature to revise and adjust the apportionment every ten years upon the basis of the last United States census, but we find nothing in the language of the section to indicate that if that

duty is not performed the State government comes to an end. If respondent's contention is sound, we have not had a legally constituted senate, and consequently a *de jure* government, since 1911. In that year both the General Assembly and the three state officers made abortive efforts, but failed, to revise and adjust the apportionment, and the General Assembly has continuously neglected to do so ever since.

Matters relating to equality of representation in the senate, as between the cities and the rural portions of the State, are without influence in the decision of the question involved in this case. Such equality of representation must be worked out through constitutional means. This court may not usurp powers which the people of the State have conferred upon other departments of their government, or reserved to themselves.

A peremptory writ is awarded. *White, Gantt* and *Ellison, JJ.,* concur; *White, J.,* in a separate opinion.

*Atwood, C. J.,* dissents in a separate opinion in which *Frank* and *Henwood, JJ.,* concur; *Frank, J.,* in a separate opinion in which *Atwood, C. J.,* and *Henwood, J.,* concur.

WHITE, J. (concurring)—I. Section 7, Article IV, of the Constitution provides for an apportionment and redistricting of the State into senatorial districts by the General Assembly, with the proviso that if for any cause the General Assembly shall fail or refuse to redistrict the State then it is the duty of the Governor, Secretary of State and Attorney-General to redistrict it. It is claimed that that proviso is a limitation upon the all-embracing legislative authority given to the General Assembly by Section 1 of that Article, and is not a grant of power.

If it is a mere limitation upon the legislative power, the argument runs, it is like other limitations in that article and other articles of the Constitution upon the power of the legislative assembly, and it was not affected by the amendment, Section 57.

In form the proviso is directly a grant of power of legislative authority to three executive officers. In effect it vests them with the legislative authority, which otherwise they would not have. But, it is argued, because collaterally and incidentally as a result of the grant it takes that much power away from the General Assembly it is a limitation. Because incidentally it has that limiting effect it loses its character as a direct and positive grant of power. The effect of the argument is that a general grant of power is a grant, while a special grant of power is not a grant.

In purpose and effect it is not even an indirect limitation upon the authority of the General Assembly. It limits in no way any function of that body. Whatever the General Assembly could do without that proviso it had authority to do with it in force. Those officers could not prevent, abridge, modify or annul any redistricting act of the General Assembly. It is said that the effect of conditional power lodged in the three officials was to "withdraw such power from the General Assembly for a limited time." It withdrew nothing. The power of the Legislature must lapse by adjournment before the three officials could act. They acted when the Legislature could not act. The language of Section 1, "subject to the limitations herein contained," means of course *limitations* in form, purpose and effect, the direct and specific limitations referred to there. It does not mean the indirect effect upon legislative functions caused by powers conferred upon other branches of the government.

II. In the amendment, Section 57, the people saw fit to restate:

"The legislative authority of the State shall be vested in the General Assembly," but added

"*And the people reserve to themselves the power to propose laws and amendments to the Constitution and to enact or reject them at the polls.*"

The people "*reserve to themselves*" the power regarding, not merely laws which are or might be enacted by the General Assembly, but laws covering every subject of legislation. By that amendment they take back, reassume, *all* legislative authority theretofore granted, with the general grant as before to the General Assembly, and the additional limitation of initiative and referendum. Can it be doubted that the initiative and referendum apply to every subject and method of legislation? The people reserve to themselves the *unlimited* power to redistrict the State, to *control* such legislation as they do all other legislation. The method provided is by initiative and referendum, the latter applying only to acts of the General Assembly. No provision is made for a referendum of redistricting by the Governor, Secretary of State and Attorney-General. Can it then be said that the people intended to leave to them an uncontrolled authority above that granted to the General Assembly? To set those officers apart and distinguish their acts as beyond the control of the people, beyond the reach of the comprehensive reservations of power in Section 57? After reserving to themselves all legislative "power" the people did not reinvest those officials as they did the General Assembly with the legislative authority formerly granted. The absence of a provision for referring the legislative acts of those officers is conclusive of the intention not to grant again the power taken away.

I concur in the majority opinion.

ATWOOD, C. J. (dissenting)—This case fell to me on regular assignment. The opinion prepared and submitted in pursuance thereof did not meet with the approval of a majority of the judges, and an opinion thereafter prepared and submitted by RAGLAND, J., has received a carrying vote insofar as it follows the majority opinion in State ex rel. Lashly v. Becker, 290 Mo. 560, 235 S. W. 1017 on the matters here in issue. Inasmuch as the reasons set forth in my opinion why the Lashly decision should be overruled necessarily apply with equal force to the majority opinion filed herein, from which I respectfully dissent, my opinion is herewith incorporated substantially as originally written and submitted. FRANK and HENWOOD, JJ., concurring, as an expression of my dissent.

This is an original proceeding in mandamus by relator, Baylis T. Gordon, to compel the Secretary of State to receive and file in his office relator's written declaration of his intention to become a candidate in the primary election to be held August 2, 1932, for the office of state senator from the Third senatorial district of Missouri, as made and promulgated April 6, 1901, and as set forth in Section 11269, Revised Statutes 1929, and to certify relator's name as such candidate to the county clerk of each county in said district.

After alleging requisite circumstances and qualifications relator in his petition states that on July 14, 1931, "the then duly elected, qualified and acting Governor, Secretary of State and Attorney-General of the State of Missouri, did attempt to redistrict said state," but that such act was illegal because in direct conflict with the initiative and referendum amendment, Section 57 of Article IV, of the State Constitution, and that even if not so in conflict, still it is void because violative of constitutional provisions that senatorial districts shall be as compact and as nearly equal in popuation as may be.

In his return respondent admits relator's qualifications and certain other allegations in his petition, generally denies the remainder and specifically denies, among other things, that the redistricting act of said three state officials is violative of the Constitution or otherwise invalid as alleged; and alleges that said redistricting is valid, that relator is not a resident of the Third senatorial district as now validly formed, and that the districting Act of 1901, under which relator seeks to file his said declaration, is unconstitutional and invalid. Relator filed reply denying the allegations of respondent's return, and pleading estoppel and application of the doctrine of *stare decisis* in defense of the redistricting Act of 1901.

In thus redistricting the State the Governor, Secretary of State and Attorney-General assumed to do so under the mandate, (State ex rel. Barrett v. Hitchcock, 241 Mo. 433, 464, 146 S. W. 40; 1 Cooley's Constitutional Limitations (8 Ed.) p. 164, n. 1), appearing

in the proviso of Section 7 of Article IV, first incorporated in the State Constitution adopted in 1875, which section is as follows:

"Senators and Representatives shall be chosen according to the rule of apportionment established in this Constitution, until the next decennial census by the United States shall have been taken, and the result thereof as to this State ascertained, when the apportionment shall be revised and adjusted on the basis of that census, and every ten years thereafter upon the basis of the United States census; or if such census be not taken, or is delayed, then on the basis of a State census; such apportionment to be made at the first session of the General Assembly after each such census: *Provided,* That if at any time, or from any cause, the General Assembly shall fail or refuse to district the State for Senators, as required in this section, it shall be the duty of the Governor, Secretary of State and Attorney-General, within thirty days after the adjournment of the General Assembly on which such duty devolved, to perform said duty, and to file in the office of the Secretary of State a full statement of the districts formed by them, including the names of the counties embraced in each district, and the numbers thereof; said statement to be signed by them and attested by the Great Seal of the State, and upon the proclamation of the Governor, the same shall be as binding and effectual as if done by the General Assembly."

Counsel for relator deny the authority of these state executive officials to perform this duty, contending that the proviso in the above quoted section was impliedly repealed by the first clause of the first sentence of the initiative and referendum amendment to the Constitution, Section 57 of Article IV, adopted in 1908. This sentence is as follows:

"The legislative authority of the State shall be vested in a legislative assembly, consisting of a senate and house of representatives, but the people reserve to themselves power to propose laws and amendments to the Constitution, and to enact or reject the same at the polls, independent of the legislative assembly, and also reserve power at their own option to approve or reject at the polls any act of the legislative assembly."

As stated in relator's plea of *stare decisis,* this contention was upheld in State ex rel. Lashly v. Becker, 290 Mo. 560, 235 S. W. 1017. It is not likely that the soundness of this decision would now be challenged by a similar proceeding in this court but for the fact that after the lapse of ten years the General Assembly, following its custom unbroken for more than fifty years, has again failed to obey the constitutional mandate to district the State for senators at its first session after each decennial census taken by the United States. It is a matter of no little concern to every citizen of the State that his right of suffrage must be exercised under the handicap of an an-

tiquated and now grossly unequal plan of senatorial redistricting laid out more than thirty years ago. It is well said in the majority opinion in the redistricting case of State ex rel. Barrett v. Hitchcock, 241 Mo. 433, 509, 146 S. W. 40: ''Inequality of representation in a republican form of government is just as offensive and unjust as is taxation without representation. Both are repugnant to and inconsistent with the American idea of government and true citizenship.'' Where, as in the Lashly case, property rules springing from the maxim of *stare decisis* are not affected, our attitude when requested to reconsider an interpretation previously adopted is thus stated in Greene County v. Lydy, 263 Mo. 77, 172 S. W. 376: ''The right doctrine, to be discriminatingly applied, is that a court, for the correction of errors in other courts, should be willing to correct its own, where its opinions are shown to be radically wrong, whether on a new appeal in the same case or in another case,'' etc. Again, in State ex rel. School District v. Gordon, 231 Mo. 547, 568, 133 S. W. 44, speaking on the same subject, we said: ''No judicial pride of opinion may foreclose such challenge, for this court has no personal ends to subserve. Its ends are alone the ends of justice to be attained by a patient, serene, and just interpretation and administration of the law; to do right as it is given to the court to see right.'' Especially is such reconsideration our duty when the question that has been decided is one involving important public rights extending through all coming time. [Cooley's Cons. Lim. (8 Ed.) p. 121, n. second column.]

Recurring to relator's position in this case, his counsel, with commendable point and brevity, say that the adoption of this amendment ''made no change in the Constitution so far as this case is concerned, except to take away from the Governor, Secretary of State and Attorney-General the power theretofore vested in them by Section 7 of Article 4 of the Constitution to district the State for senators and to vest that power in the people of the State.'' With equal directness counsel for respondent insist that by no reasonable intendment can it be said that such change was made.

The interpretation of the initiative and referendum amendment urged by relator, following the majority opinion in the Lashly case from which we quote, is that this section ''deals with the course of legislation,'' and ''undertaking to secure the rights of referendum and initiative upon all legislative subjects,'' the framers of this amendment intended by the first clause thereof to gather up and center all legislative power or authority in the General Assembly as ''one single legislative forum; so that they (the people) could invoke either the referendum or the initiative,'' thereby excluding ''legislative power or authority from other independent branches, or officers, of the government,'' and so, they say, repealing the proviso

in above quoted Section 7 of Article IV. [290 Mo. l. c. 581, 582, 583.]

The established rules of construction applicable to statutes are also applicable to constitutions. [State ex rel. City of Carthage v. Hackmann, 287 Mo. 184, 190, 229 S. W. 1078; State ex rel. Buchanan County v. Imel, 242 Mo. 293, 301, 146 S. W. 783.] A fundamental rule of constitutional as well as statutory interpretation is that the legislative intent "should be sought first of all in the words and language employed; and if the words are free from ambiguity and doubt, and express plainly, clearly and distinctly the sense of the framers of the instrument, there is no occasion to resort to other means of interpretation." [2 Lewis-Sutherland Statutory Construction (2 Ed.) sec. 366, p. 798; 1 Cooley's Cons. Lim. (8 Ed.) p. 125, n. 1, p. 127, n. 1.]

The words used in the above quoted first sentence of the initiative and referendum amendment appear to be free from ambiguity and doubt, and relator makes no claim to the contrary. In the latter portion of this sentence the purpose of the amendment is clearly expressed as being to enable the people (italics ours) to "reserve to themselves power *to propose laws and amendments to the constitution, and to enact or reject the same at the polls, independent of the legislative assembly, and also* reserve power at their own option *to approve or reject at the polls any act of the legislative assembly."* It follows that language so plain neither calls for nor admits of any construction, and necessarily precludes existence of the broader purpose assumed to exist when the majority opinion held that it was the intent of the framers of this amendment to secure thereby (italics ours) "the rights of referendum and initiative *upon all legislative subjects."*

Applying the same rule of interpretation to the preceding clause of the first sentence of this amendment, it must be taken to mean just what it says, to-wit: "The legislative authority of the State shall be vested in a legislative assembly, consisting of a senate and house of representatives," etc. But apart from and existing long prior to the adoption of this amendment was Section 1 of Article IV of the Constitution which, pursuant to the plan of separation of powers, also covered the whole field of delegation of legislative power to the General Assembly in like manner, except that it contained a limitations clause, as follows (italics ours):

"The legislative power, *subject to the limitations herein contained,* shall be vested in a Senate and House of representatives, to be styled 'The General Assembly of the State of Missouri.' "

Now how should these two provisions be construed? In 1 Cooley's Const. Lim. (8 Ed.) 127, n. 2, it is said that a very proper rule of constitutional and statutory construction is "that *the whole is to be examined with a view to arriving at the true intention of each part:*

and this Sir Edward Coke regards as the most natural and genuine method of expounding a statute.'' Also, the same authority (p. 129) says: ''Upon the adoption of an amendment to a constitution, the amendment becomes a part thereof; as much so as if it had been originally incorporated in the Constitution; and it is to be construed accordingly. [State v. Chicago, etc., R. Co., 195 Mo. 228, 93 S. W. 784, 113 Am. St. Rep. 661; Steele, Hopkins & Meredith Co. v. Miller, 92 Ohio St. 115, 110 N. E. 648, L. R. A. 1916C, 1023, Ann. Cas. 1917C, 926.] If possible, it must be harmonized with all the other provisions of the Constitution. [Hammond v. Clark, 136 Ga. 313, 71 S. E. 479, 38 L. R. A. (N. S.) 77; State v. Jackson, 119 Miss. 727, 81 So. 1.] If this cannot be done the amendment will prevail.'' [Cases last above cited: also, People ex rel. Killeen v. Angle, 109 N. Y. 564, 17 N. E. 413.]

If, as relator insists, the first clause of the first sentence of the amendment here under consideration was intended to gather up and redelegate all legislative power to the General Assembly, it contains no limitations clause and having been adopted later and being in irreconcilable conflict with Section 1 because it is an unlimited delegation of legislative power, it repealed the limitations clause in Section 1 and delegated all legislative power without any limitation whatsoever to the legislative branch or General Assembly. [1 Lewis-Sutherland Stat. Const. (2 Ed.) 475, sec. 250, n. 78, and Gorham v. Luckett, 6 B. Monroe, 45 Ky. 146, 154, therein cited; 1 Cooley's Cons. Lim. (8 Ed.) 129, n. 6, and cases cited; Black's Constitutional Law, p. 54, n. 41; 12 C. J. p 709, sec. 60 (c), n. 52; State ex rel. Lashly v. Becker, 290 Mo. 560, 589, 235 S. W. 1017.]

The majority opinion in the Lashly case undertakes to avoid this inevitable result of relator's contention by merely saying ''it is unthinkable to say that such was the intent of the people,'' and at the same time *assuming* to extend the purpose of the initiative and referendum amendment, as already observed, beyond that clearly expressed in the amendment itself so as to include ''all legislative subjects.'' [290 Mo. 1. c. 582.] Neither do we believe that the framers of this amendment intended to repeal any of the limitations then contained in the Constitution upon the legislative power delegated to the General Assembly, and if there had been any intention that this clause should serve the purpose of gathering up and redelegating all legislative authority to the General Assembly as ''one single legislative forum,'' then surely a limitations clause such as that appearing in Section 1 would have been then and there expressly inserted and not left to be brought in by judicial construction. When construing and interpreting an amendment to a constitution resort may be had to the title to the act of the Legislature proposing the amendment, (12 C. J. p. 709, n. 41), but no such purpose can be gathered from such

title to this amendment which is as follows: "Joint and concurrent resolution submitting to the qualified voters of Missouri an amendment to the Constitution thereof concerning the initiative and referendum." [Laws of 1907, p. 452.]

As a matter of fact, the reason for the presence of this first clause of the first sentence of the amendment is apparent from the legislative history of the amendment, proper to consider in ascertaining the intent of the framers (2 Lewis-Sutherland Stat. Cons. (2 Ed.) p. 884, n. 47), which is that its text was copied almost literally from the initiative and referendum amendment that had previously been adopted in Oregon as well as other states having no such constitutional provision as our Section 1 of Article IV. Consequently, if in proposing and adopting the amendment now before us any thought was given to the force and effect of this first clause it must have been that it was a mere reaffirmation of Section 1, introductory or prefatory to a statement of the one purpose of the amendment which was to further limit the legislative power of the General Assembly by carving out and reserving to the people the powers to initiate and refer laws as therein stated, and that this clause neither added anything to nor took anything from Section 1 of Article IV, which was already a part of the Constitution. Indeed, counsel for ‾ ' ' ‾‾ ‾‾‾ in their brief:

"The two sections stand *in pari materia* and are to be construed together. So construing them, Section 57, in legal effect said: 'The legislative authority of the State, *subject to the limitations herein contained*, shall be vested in a legislative assembly consisting of a Senate and House of Representatives.' "

Having thus made the limitations clause of Section 1 a part of the first clause of Section 57, counsel for relator, following the majority opinion in the Lashly case, say that this first clause repeals by implication the proviso of Section 7 because the proviso is "a grant of power and not a limitation." However, the reason thus given is an unwarranted play on words, for it is a truism universally recognized in the interpretation of state constitutions that every grant of power is also an implied limitation upon the source of grant and upon any other agency to which the same power has been or might be granted. But more of this anon.

Repeals by implication are not favored, (1 Cooley's Cons. Lim. (8 Ed.) p. 316), and the above conclusion is evidently reached by an unqualified application of the general rule, mentioned by the same authority, on page 317, second column, "that when a new statute is evidently intended to cover the whole subject to which it relates, it will by implication repeal all prior statutes on that subject." But for all their pains we cannot see that counsel have aided their posi-

tion or offered any justification for the conclusion reached. They do not claim that Section 57 repealed any part of Section 1 because they say the two sections are *in pari materia* and mean the same thing. Nor do they contend that the provision in Section 7 is not, in effect, a special delegation of power to the state executive officers therein named. If it does not fall within the limitations clause which they say, and we think rightly so, should be read into Section 57, how could it have been within the meaning of the same clause appearing in Section 1? The nature of the power so delegated was not changed by the passage of Section 57. If it never was a limitation upon the general delegation of legislative power to the General Assembly it cannot be said that it ever was valid or that it imparted even color of validity to any senatorial districting that has been made since 1875. And yet, notwithstanding the redistricting of 1901, under which relator claims right to a peremptory writ of mandamus against respondent, and all prior redistrictings made since the adoption of the Constitution in 1875 have been made by state executive officers assuming to act under this power, we have time and again affirmed the validity of this proviso and even now no one suggests that it was not a limitation within the meaning of the limitations clause of Section 1.

If we should concede relator's above contention, that the proviso in question is not a limitation upon the general grant of legislative power in Section 1 which is reaffirmed in the first clause of Section 57, the validity of the proviso even prior to the adoption of Section 57 could be sustained only by invoking a well recognized exception to the general rule of construction last above stated, which is that (italics ours) "effect must be given to a *particular* intent plainly expressed in one part of a constitution, though apparently opposed to a *general* intent deduced from other parts." [1 Cooley's Const. Lim. p. 129, n. 2, citing Warren v. Shuman, 5 Tex. 441, 454.] However, if this doctrine can be invoked to sustain the proviso as an expression of a *particular* intent that should prevail though apparently opposed to the *general* intent of Section 1 simultaneously adopted, it may with equal propriety be invoked with like effect when the proviso is read in connection with the same *general* intent identically expressed in Section 57 subsequently adopted. If the first clause of the first sentence of Section 57 "deals with the course of legislation" it does so *generally* to accomplish the purpose of the initiative and referendum as therein expressed, while Section 7 manifestly deals with the same subject *specially* to accomplish the different purpose of senatorial redistricting.

The doctrine here applicable is thus stated in 25 Ruling Case Law, page 922, section 171:

"To effect an implied repeal of one statute by another they must both relate to the same subject and have the same object or purpose. Where there is a difference in the whole purview of two statutes apparently relating to the same subject, the former is not repealed."

Also, 36 Cyc. page 1151, section IV:

"Where there is one statute dealing with a subject in general and comprehensive terms and another dealing with a part of the same subject in a more minute and definite way the two should be read together and harmonized, if possible, with a view to giving effect to a consistent legislative policy; but to the extent of any necessary repugnancy between them, the special will prevail over the general statute. Where the special statute is later, it will be regarded as an exception to, or qualification of, the prior general one; and where the general act is later, the special will be construed as remaining an exception to its terms, unless it is repealed in express words or by necessary implication."

So, in Sedgwick on Construction of Statutory and Constitutional Law (3 Ed.) p. 98, the author observes with respect to this rule:

"The reason and philosophy of the rule is, that when the mind of the legislator has been turned to the details of a subject, and he has acted upon it, a subsequent statute in general terms, or treating the subject in a general manner, and not expressly contradicting the original act, shall not be considered as intended to affect the more particular or positive previous provisions, unless it is absolutely necessary to give the latter act such a construction, in order that its words shall have any meaning at all."

We have also thus stated the doctrine in State ex rel. Tax Commission v. Crawford, 303 Mo. 652, 662, 262 S. W. 341:

"Further, a special act is not to be held repealed by one of general nature, even of *later* enactment, in the absence of negative words or unless an irreconcilable inconsistency is necessarily raised. [State ex rel. M. & M. Railroad Co. v. County Court, 41 Mo. 453.] And if a special provision applicable to a particular object be inconsistent with even a later general law, the special provision will prevail. [State v. Green, 87 Mo. 583.]"

So, bearing in mind that the proviso in Section 7 is a special delegation of legislative power withdrawn from the General Assembly for a particular purpose, and that the first clause of Section 57 is at most a reaffirmation in identical terms of a previous general delegation of legislative power to the General Assembly preliminary to the accomplishment of a wholly different purpose, which was not "to secure the rights of referendum and initiative upon all legislative subjects," as relator erroneously assumes, but as stated in the amendment itself, to reserve to the people "power

to propose laws and amendments to the Constitution, and to enact or reject the same at the polls, independent of the legislative assembly, and also . . . at their own option to approve or re-ject at the polls any act of the legislative assembly,'' it seems clear that the labored construction relied upon by relator to bring about an implied repeal of the proviso in question is wholly unwarranted.

But the power to redistrict, delegated by the proviso in Section 7 of Article IV, if legislative in character as contended by relator and as held in the majority opinion in the Lashly case, is indubitably a limitation upon the legislative power generally delegated to the General Assembly by Section 1, and if a limitation upon the power there delegated it is a limitation upon its reaffirmation in the initiative and referendum amendment which is Section 57. While such delegation of power is sometimes loosely referred to as a ''grant,'' the authorities uniformly hold that it is in reality a limitation because any valid ''grant'' of power to a special agency is necessarily a limitation upon another agency to which the same power has been generally granted, and counsel for relator of necessity rest their claim that it is not a limitation on the *ipse dixit* of the majority opinion in the Lashly case.

The distinction is thus clearly indicated in Black's Constitutional Law (Hornbook Series (3 Ed.) p. 351, sec. 137), (italics ours):

''Under the system of government in the United States, the people of each of the states possess the inherent power to make any and all laws of their own governance. But a portion of this plenary legislative power has been surrendered by each of the states to the United States. The remainder is confided by the people of the state, by their constitution, to their representatives constituting the state legislature. At the same time, and by the same instrument, they impose certain restrictions and limitations upon the legislative power thus delegated. *But state constitutions are not to be construed as grants of power (except in the most general sense), but rather as limitations upon the power of the state legislature.* From these principles it follows that the legislature of a state may lawfully enact any law, of any character, on any subject, unless it is prohibited, in the particular instance, either expressly or by necessary implication, by the provisions of some law which it is bound to regard as supreme.''

On page 352, note 42, the same authority cites with approval Collins v. Henderson, 11 Bush (Ky.) 74, to the effect that ''a constitutional provision directing a particular thing to be done is a limitation on the legislative power to the extent that the legislature cannot lawfully take any action which would prevent the doing of the thing directed.'' In 1 Cooley's Cons. Lim. (8 Ed.) p. 81, with reference to state constitutions it is said, (italics ours):

"*By the constitution which they establish, they not only tie up the hands of their official agencies, but their own hands as well;* and neither the officers of the State, nor the whole people as an aggregate body, are at liberty to take action in opposition to this fundamental law."

On page 96 the same authority quotes with approval Hamilton v. St. Louis County Court, 15 Mo. 13, per Bates, *arguendo,* as follows, (italics ours):

"*A written constitution is in every instance a limitation upon the powers of government in the hands of agents;*" etc.

So, in note on page 176, of same authority, the case of Russ v. Com., 210 Pa. St. 544, 60 Atl. 169, 1 L. R. A. (N. S.) 409, 105 Am. St. Rep. 825, is cited with approval to the following effect:

"The test of legislative power is constitutional restriction. What the people have not said in the organic law their representatives shall not do, they may do."

And on the same page, State v. Whisman, 36 S. D. 260, 154 N. W. 707, L. R. A. 1917B, 1; and other cases to like effect:

"The inhibition of a Constitution may be either express or implied; that is the Constitution may expressly prohibit any specified act of the Legislature, or the Constitution by its inherent terms may of necessity prohibit certain acts of a Legislature by reason of the inherent conflict that would arise between the terms of the Constitution and the power claimed in favor of the Legislature."

Also, on page 177 from Denio, Ch. J., in People v. Draper, 15 N. Y. 532, 543, as follows (italics ours):

"The first article lays down the ancient limitations which have always been considered essential in a constitutional government, whether monarchial or popular; and there are scattered through the instrument a few other provisions in restraint of legislative authority. But the affirmative prescriptions and the general arrangements of the Constitution are far more fruitful of restraints upon the Legislature. Every positive direction contains an implication against anything contrary to it, or which would frustrate or disappoint the purpose of that provision. The frame of the government, *the grant of legislative power itself,* the organization of the executive authority, the erection of the principal courts of justice, *create implied limitations upon the law-making authority* as strong as though a negative was expressed in each instance; but independently of these restraints, express or implied, every subject within the scope of civil government is liable to be dealt with by the Legislature." Also, see State ex rel. Henson v. Sheppard, 192 Mo. 497, 506, 507, 91 S. W. 477; McGrew v. Railroad, 230 Mo. 496, 522, 132 S. W. 1076; Rourke v. Holmes St. Ry., 257 Mo. 555, 579, 166 S. W. 272; State ex rel. v. Burton, 266 Mo. 711, 717, 182 S. W. 146; Pitman v. Drabelle, 267

Mo. 78, 84, 183 S. W. 1055; Harris v. Bond Co., 244 Mo. 664, 687, 149 S. W. 603, and other cases too numerous for present mention. As far as we have been able to ascertain the foregoing distinction has been universally observed by the courts of this State, except in the Lashly case where the conclusion that the proviso now under consideration is not a limitation was announced without citation of any supporting rule or authority.

We have thus indicated at length the limiting characteristic, both express and implied, of state Constitutions because it demonstrates the natural force and effect of the plain language of Section 7 which compels the conclusion that its proviso is a limitation upon the legislative power delegated to the General Assembly, and, therefore, it is not impliedly repealed by the first clause of Section 57, but is excepted therefrom by the limitations clause which relator says must be read into the initiative and referendum amendment. The natural and appropriate office of a proviso is to restrain or limit the antecedent clause (25 R. C. L. p. 984, n. 8; 36 Cyc. p. 1162, n. 56; Brown v. Patterson, 224 Mo. 639, 124 S. W. 1), which in this case is the specific delegation of senatorial redistricting power to the General Assembly. Here, the delegation or ''grant'' (the term used is unimportant) of power in the proviso is necessarily an exception to and, to the extent of its terms, a limitation on the power delegated in the antecedent clause because the power thus delegated or granted to one state agency is by necessary implication at the same time withdrawn from the other agency.

The limitation thus necessarily implied by the proviso of Section 7 is of the same character, differing only in degree, as that arising from Section 3 of the same article of the Constitution which delegates the duty to district to the county court, and not to the General Assembly, ''when any county shall be entitled to more than one Representative;'' and the same duty to the circuit court of such county when the county is ''entitled to more than ten Representatives.'' Also, the last sentence of Section 6 of the same article provides: ''When any county shall be entitled to more than one Senator, the circuit court shall cause such county to be sub-divided into districts,'' etc. Can there be any reasonable doubt that these, too, are limitations upon the districting power of the General Assembly such as contemplated in the limitations clause appearing in Section 1 and properly read into the first clause of Section 57? And yet these wise and explicit delegations of power to the local authorities must under the reasoning of the Lashly decision be swept aside on the ground that the *assumed* purpose of Section 57 was to gather up and center all legislative power in the General Assembly in order ''to secure the rights of referendum and initiative upon all legislative subjects.''

We should not, in order to sustain relator's contention that this is not a limitation, set at naught well established rules of constitutional and statutory interpretation by taking Section 7, which is in language so clear and plain that it does not call for construction and therefore admits of none, and following relator's suggestion tear its single sentence asunder at the beginning of the proviso, make of it two separate sentences, and call the first sentence both a limitation and a grant of power to the General Assembly to redistrict and the second merely a "conditional grant" or "grant over" of the same power to the three state executive officers therein named but not a limitation upon the legislative power of the General Assembly. However, even if such were done the second sentence would still be an implied restriction or limitation upon the power delegated in the first, because in the redistricting cases of People ex rel. Carter v. Rice, 135 N. Y. 473, and Botti v. McGovern, 97 N. J. L. 353, 356, essentially the same language as that appearing in the antecedent clause now before us but without any such proviso in the constitutions construed was held to mean that "the duty (to redistrict) is a continuous one, and is cast in turn upon each Legislature succeeding that which has defaulted in the performance of the obligation, until the obligation is fulfilled." Yes, even if the word "Provided" and its antecedent clause were eliminated from Section 7, and this section contained nothing more than a delegation or "grant" of senatorial redistricting power for any given period of time to the state executive officers therein named, it would still clearly be a limitation upon the general delegation of legislative power to the General Assembly in Section 1 and reaffirmed in Section 57, because its necessary effect would be to take away from the General Assembly that much of the power generally delegated to it and by "inexorable implication" forbid the General Assembly exercising such power during such time.

If the proviso in Section 7 ever meant anything, by every applicable rule of interpretation it meant and still means that it is a limitation as above indicated, and such is the meaning that we have adopted in State ex rel. Major v. Patterson, 229 Mo. 364, 388, 129 S. W. 894; State ex rel. Halliburton v. Roach, 230 Mo. 408, 428, 130 S. W. 689; State ex rel. Barrett v. Hitchcock, 241 Mo. 433, 458, 513, 146 S. W. 40; and in every other decision that has recognized this proviso as ever having had any validity. Therefore, relator's contention that the proviso is not a limitation on the legislative power of the General Assembly should be overruled. Being such a limitation it was excepted from the general delegation of legislative power in both Sections 1 and 57 and was not repealed by the latter.

We have reached the above conclusions with little reference to extrinsic circumstances because the language of the sections considered is so clear and plain that more is unnecessary, and resort thereto is

never permissible to change the plain meaning of the written word. As said in Cooley's Cons. Lim. (8 Ed.) p. 141, "We are not to import difficulties into a constitution, by consideration of extrinsic facts, when none appear upon its face." [See also, Hamilton v. County Court, 15 Mo. 3; State ex rel. Heimberger v. Board of Curators of University of Missouri, 268 Mo. 598, 188 S. W. 128.]

In the majority opinion in the Lashly case (290 Mo. 1. c. 587) it was said that if after the General Assembly of 1921 failed to redistrict the State, the people had initiated such a law which received the required vote and was thereby adopted, and in the interim there had been a redistricting under this proviso, then the initiated law would prevail, and that "the very fact that the people have the unrestricted right to initiate laws (within constitutional restrictions) demonstrates that these officers were shorn of legislative authority by this amendment." As we view the hypothesized facts and the assumptions of law upon which they proceed, which are mere *obiter*, they prove nothing except that the law last enacted would stand in lieu of the first enactment; but this is far from saying that the body that promulgated the first had no power to do so. One might with equal propriety say that if the General Assembly passed a redistricting bill and thereafter the people initiated and adopted such a law and the latter stood as against the former it would demonstrate that this amendment had shorn that body of such legislative power.

Adverting to this argument, though not espousing it, counsel for relator suggest that if the proviso is allowed to stand the scheme of redistricting would be "cumbersome, confusing and productive of possible mischief." To whom will it be so? Certainly not to the voters of the State because the history of senatorial redistricting in the State for more than fifty years has demonstrated that the only practical means to that end is under such a proviso. Such evidently was the mature judgment of the framers of the Constitution of 1875 when they made this proviso a part of the fundamental law, having lived under the Constitution of 1865 which delegated this power only to the General Assembly. If they deemed it unlikely that a body so numerous as the General Assembly would undertake the performance of a duty so difficult, delicate and fraught with contrariety of views, we should not accredit the framers of the Amendment of 1908 with less wisdom. They doubtless considered it less likely, as the ensuing years have proved, that such duty would be performed by direct action of the people in their exercise of the far more unwieldy power of the initiative. Even if some confusion should result, which we do not concede, fear of such should not be permitted to thwart the manifest legislative intent to provide a fairly certain and expeditious means of redistricting when others fail, and it would be most unreasonable to hold that by their adoption of the initiative and ref-

erendum amendment the people intended to deprive themselves of that which their experience had shown was the only practical means of obtaining senatorial redistricting. In the light of what they actualꞁid we cannot say that they intended to repeal this proviso by implication when they could so easily have done so by their written word. Nor should we burden this opinion with a discussion, which at best would be merely *obiter*, of questions that relator imagines may hereafter confront this court. When such cases arise it will be time to consider them. It is enough to say that the judiciary should plainly declare the intent of the law as the Legislature has plainly written it. When the meaning of a law is clear, its consequences, even if evil, can only be avoided by a change of the law itself, to be effected by the legislative branch of government and not by judicial construction. [Lewis-Sutherland Stat. Cons. (2 Ed.) p. 702-3, n. 38.]

We now turn to a consideration of relator's claim that the redistricting of 1931 violates the requirements of Sections 5 and 9 of Article IV of the State Constitution as to compactness of territory and equality of population. These sections are as follows (italics ours):

"Section 5. The Senate shall consist of thirty-four members, to be chosen by the qualified voters of their respective districts for four years. For the election of Senators the State shall be divided into *convenient districts, as nearly equal in population as may be*, the same to be ascertained by the last decennial census taken by the United States."

"Section 9. Senatorial and Representative districts may be altered, from time to time, as public convenience may require. When any Senatorial district shall be composed of two or more counties, they shall be contiguous; *such districts to be as compact as may be*, and in the formation of the same no county shall be divided."

According to the great weight of authority courts have jurisdiction to determine whether or not an apportionment act contravenes constitutional requirements. [36 Cyc. 848; 9 R. C. L. p. 1002, sec. 23; 2 A. L. R. 1334; Attorney-General v. Apportionment Commissioners, 224 Mass. 598, 602.]

The scope of such inquiry is thus indicated in 36 Cyc. 848:

"An apportionment act which contravenes the constitutional requirements is void, and the courts have jurisdiction to pass upon the validity of apportionment acts and may set aside an unconstitutional act as an abuse of legislative discretion; and in determining whether the Legislature has abused its discretion will take into account all the circumstances of the case. But the Legislature is vested with considerable discretion in making apportionments, and its action

is not subject to control or review by the courts unless such discretion is plainly and grossly abused,, and an apportionment will not be declared invalid except for serious defects therein."

Also, in Brophy v. Apportionment Commissioners, 225 Mass. 124, 128, the constitutional requirement there being that representatives be assigned "equally, as nearly as may be, according to the relative number of legal voters in the several districts," the court speaking through RUGG, C. J., said:

"There is room for some diversity of honest opinion in selecting among the various possible methods the best one for forming the districts. Sagacity is demanded in reaching a right determination. The division and apportionment is not a mere example in arithmetic. It involves the exercise of sound judgment and practical wisdom. When the report disregards a reasonable application of sound judgment, acting within the positive command for equality of voting power contained in the amendment to the Constitution, then it is a nullity. Every reasonable presumption must be made in favor of the report of the commissioners. The function of the court is not to review or revise the exercise of official judgment within its legitimate limits, but only to declare void a division and apportionment so vicious in its nature as to transcend the constitutional power of the commissioners."

The redistricting act now before us is attended by the same presumption of validity that attends a statute (2 A. L. R. 1342; Donovan v. Apportionment Commissioners, 225 Mass. 55, 58), and the burden is on relator to specify and show wherein it contravenes the above constitutional requirements. His counsel say that we "should not have to consider any case except the Hitchcock case (241 Mo. 433, 478, 479), to reach the conclusion that this attempted redistricting of 1931 violates the constitutional provisions with reference to compactness and equality of population." Comparing certain districts in the 1931 plan with districts included in the attempted redistricting of 1911, which they claim was condemned by the decision in that case, they say that the redistricting of 1931 "must give way, or the Hitchcock case be overruled." As pointed out with admirable precision in the majority opinion in the Lashly case (290 Mo. 1. c. 575-6), the majority opinion in the Hitchcock case actually ruled nothing but the single question of the court's jurisdiction which was denied in the latter part of the opinion, thus rendering all else that was said mere *obiter* as plainly pointed out in the two separate concurring opinions. So, relator's standards of comparison so confidently drawn from this opinion do not in fact have the purported authority of judicial precedent.

Of course, the constitutionality of a redistricting measure is not to be determined by the fact that in comparison with another such

measure, the merits of which have never been adjudicated and under which the right in question is not claimed, it appears to be better or worse than the latter. The true test to be applied to the plan or plans actually under consideration is thus stated by the Supreme Judicial Court of Massachusetts in 224 Mass. 598, 607, again speaking through RUGG, C. J., who cites with approval Baird v. Supervisors of Kings Co., 138 N. Y. 95, 114:

"When fair minded men from an examination of the apportionment and division can entertain no reasonable doubt that there is a grave, unnecessary and unreasonable inequality between different districts, the Constitution has been violated and it is the duty of the court so to declare."

Also, in Ragland v. Anderson, 125 Ky. 141, 158, 100 S. W. 865, 869, cited with approval in Stiglitz v. Schardien, Ky. Court of Appeals, 40 S. W. (2d) 315, 319, it is said:

"It is not insisted that the equality of representation is to be made mathematically exact. This is manifestly impossible. All that the Constitution requires is that equality in the representation of the State which an ordinary knowedge of its population and a sense of common justice would suggest."

It is said in 9 Ruling Case Law, page 1003, section 24, that in passing on such questions as are presented here "the court is confined in its determination to matters of which it may take judicial notice. The two considerations which enter into the determination of all of these questions are those of population and of geographical arrangement. Pursuant to this authority the courts will take judicial notice of a census, whether taken under the authority of the state or the United States, and will also take judicial knowledge of the location, general boundaries, and the juxtaposition of the several counties, towns, and wards and of matters of common knowledge."

As to the constitutional requirement that districts shall "be as compact as may be," counsel for relator say that "a casual examination of the map in this case will disclose that many of these districts are not compact, and the question of convenience has not been considered," but they mention only districts 1, 4, 11 and 24 as deficient in this respect, and content themselves with merely saying so. It is almost needless to suggest that in so doing relator fails to carry the burden, which is his, of showing wherein these districts are not "as compact as may be." The mere physical boundaries of districts as shown on a map do not necessarily determine their constitutionality from the standpoint of compactness, although the districts created in 1931, compared even in this respect with those created in 1901 and 1875 as we shall presently show they may be, appear to be far more compact. The Constitution itself subordinates compactness to the further requirement that "no county shall be divided;" and in

People v. Thompson, 155 Ill. 451, 479, it is said that compactness "may also, in application, be modified by the requirement of equality in population." Inasmuch as equality of representation is manifestly the end sought under our Constitution this latter observation must be sound. Therefore, relator should have indicated wherein these districts, with due regard to these limitations, "may be" more compact, but he has not done so and the redistricting of 1931 in this respect, therefore, stands unimpeached.

In discussing the redistricting act of 1931 from the viewpoint of the other constitutional requirement of equality in population counsel for relator again fall into the error of comparing it with a redistricting act, that of 1921, the merits of which were never adjudicated by any court and under which no rights are here claimed. However, the senatorial districting made by members of the constitutional convention of 1875 and incorporated by that body in the Constitution of 1875 along with their requirements as to all future redistrictings, may be taken as a fair standard of constitutionality in the respects above mentioned, for it will not be presumed that they grossly disregarded their own requirements. Also, the redistricting act of 1901 is before us for consideration because relator claims right to our writ of mandamus thereunder. [9 R. C. L. p. 1004, sec. 24, notes 4 and 5; People v. Rice, 135 N. Y. 473, 507, 508, 509; Houghton County v. Secretary of State, 92 Mich. 638, 653, 654.]

The United States census of 1930, of which we take judicial notice, showed the population of Missouri as 3,629,367, making the ratio of representation 106,746 for each of the 34 state senators. The census of 1900 showed a population of 3,106,665 making the ratio of representation 91,372. The census of 1870 showed a population of 1,721,295 making a ratio of 50,626.

Adopting 107,000 as the approximate ratio for the redistricting of 1931, counsel for relator specify the following districts, outside of St. Louis and Jackson County in which Kansas City is situated, in support of their claim that it is violative of the constitutional provision that the districts so formed shall be "as nearly equal in population as may be:" District 2 having a population of 112,425 or 5,452 in excess of the ratio; district 8 having a population of 97,365, or 9,635 less than the ratio; district 14 having a population of 96,959, or 10,041 less than the ratio; district 17 having a population of 95,565, or 11,435 less than the ratio; district 18 having a population of 94,163, or 12,837 less than the ratio, district 20 having a population of 99,077 or 7,923 less than the ratio. The total excess in all 34 districts was 121,771 (relator states excess as 27,400 but this figure includes excess of only one district in Jackson County and one in the city of St. Louis), total deficiency 129,205, and the sum total of variations 250,976, or .069 of the total population of the State.

Contrast the above with the following far greater excesses and deficiencies in nearly twice as many districts created by the redistricting of 1901, based on the census of 1900 showing more than a half million less population: District 2 with a population of 121,838 and an excess of 30,466; district 6 with a population of 72,611 and a deficiency of 18,761; district 9 with a population of 70,913 and a deficiency of 20,459; district 10 with a population of 105,590 and an excess of 14,218; district 11 with a population of 65,256 and a deficiency of 26,116; district 12 with a population of 69,658 and a deficiency of 21,714; district 19 with a population of 119,703 and an excess of 28,331; district 20 with a population of 120,710 and an excess of 29,338; district 21 with a population of 112,641 and an excess of 21,269; district 23 with a population of 72,993 and a deficiency of 18,379; district 24 with a population of 71,275 and a deficiency of 20,097. The total excess in all 34 districts was 188,445, total deficiency 188,458, and the sum total of variations 376,903, or .121 of the then total population of the State.

Also, the following shown by the constitutional districting of 1875 based on the census of 1870 under which Missouri had less than half the population on which the redistricting of 1931 is based: District 2 with a population of 61,578 and an excess of 10,952; district 4 with a population of 59,135 and an excess of 8,509; district 5 with a population of 56,300 and an excess of 5,654; district 6 with a population of 58,160 and an excess of 7,514; district 8 with a population of 43,498 and a deficiency of 7,128; district 10 with a population of 30,977 and a deficiency of 19,649; district 13 with a population of 44,409 and a deficiency of 6,217; district 24 with a population of 44,667 and a deficiency of 5,959. The total excess in all 34 districts was 103,374, total deficiency 52,060 and the sum total of variations 155,434, or .09 of the then total population of the State.

The redistricting of 1931 allots four senators to Jackson County, which contains the city of Kansas City, the total population so represented being 470,454, or an average excess of 10,867 in each of these four districts. In the districting of 1875 Jackson County, with a population in 1870 of 55,041, had an excess of 4,415 above the ratio that entitled it to one senator. In the redistricting of 1901 it had a population of 195,193, or an excess of 12,449 above the ratio that entitled it to two senators.

The redistricting of 1931 allots seven senators to the city of St. Louis with a population of 821,960 and an average excess of 10,422 in each district. In the districting of 1875 it was allowed six senators, with a population in 1870 of 351,189 or an average excess of 7,905 in each district. In the redistricting of 1901 it was given the same number of senators with a population of 575,238 and an average excess of 4501 in each district.

Counsel for relator say that the city of St. Louis and Jackson County, having "a combined population of 1,292,414, are entitled to 12 senators," but they do not indicate which should have the additional senator. If given to the city of St. Louis it would create an average deficiency of 4001 in each of the eight districts, and Jackson County's excess would remain unchanged. If given to Jackson its five districts would have an average deficiency of 12,655, much greater than the present average excess, and the condition of the St. Louis districts would remain unchanged. Nor does relator indicate, as he should do if really trying to carry his burden of showing that the districts created by the act of 1931 are not "as nearly equal in population as may be," that in one case or the other the remainder of the State could be redistricted without increasing the inequality of representation when this extra senator is taken therefrom.

We are bound to take judicial notice of the foregoing facts and figures which plainly bespeak the reasonableness and good faith of the discretion exercised in the redistricting of 1931. And yet it is blandly insisted in relator's behalf that, notwithstanding the redistricting of 1901, under which he claims the right to file, would, for example, give Jackson County with a present population of 470,454, only two senators affording a combined representation of 213,492 according to the state-wide ratio and leaving an excess population of 256,962 wholly unrepresented, he is entitled to our peremptory writ of mandamus on the ground that the redistricting of 1931, which shows an aggregate excess for the same county of only 43,468, is unconstitutional for want of equality in representation. It is obvious that such a ruling would force upon the voters of the State other gross inequalities in representation just as apparent and almost as glaring. As said in the similar case of People ex rel. Carter v. Rice, 135 N. Y. 473, 506, 509, holding that such a consequence was a proper matter of consideration: "This would be a travesty on the law and upon all ideas of equality, propriety and justice."

It is no answer to say that the redistricting of 1931 cannot be compared to those of 1875 and 1901 because relator has not raised the constitutionality of the latter in this proceeding. The act of 1931 can be held unconstitutional only on a clear showing that the discretion necessarily vested in the makers has been plainly and grossly abused (People ex rel. Carter v. Rice, 135 N. Y. 473, 501, quoted with approval in Matter of Sherrill v. O'Brien, 188 N. Y. 185, 196), so that "fair minded men from an examination of the apportionment and division can entertain no reasonable doubt that there is a grave, unnecessary and unreasonable inequality between different districts." [Attorney-General v. Apportionment Commissioners, 224 Mass. 598, 607, supra.] A senatorial districting that satisfied the sound judg-

ment and practical wisdom of the illustrious framers of the Constitution of 1875, who must have been guided by the same end of equality in representation which they laid down for all future redistrictings, is certainly not an inappropriate criterion of what fair minded men should regard as a reasonable variation in this respect. Also, one who challenges the constitutionality of a redistricting on the ground of inequality of representation as between the several districts cannot before fair minded men avoid a comparison on the same ground of that redistricting with the one which he asserts should be effective. When, as here, the redistricting directly assailed does not appear to transcend the bounds of a reasonable discretion, and when comparisons such as the above show that the variation in representation between districts and the total range of variation in the redistricting of 1931 are less than either of the others, and when relator utterly fails, as in this case, to show wherein the districts could reasonably be made more nearly equal in population, we should not hesitate to declare the redistricting of 1931 constitutional. We have carefully considered all cases cited in relator's behalf and find none of them opposed to the reasoning above followed.

For the reasons stated our alternative writ of mandamus heretofore issued should be quashed. *Frank* and *Henwood, JJ.,* concur.

FRANK, J. (dissenting)—I do not agree with the reason employed or the conclusion reached in the principal opinion. I, therefore, respectfully dissent therefrom and concur in the able dissenting opinion written by Chief Justice ATWOOD.

The question in the case is whether or not Section 57 of Article IV of the Constitution repealed the proviso contained in Section 7 of the same Article which makes it the mandatory duty of the Governor, Secretary of State and Attorney-General to district the State senatorially in event the General Assembly fails or refuses to do so at the time specified in said Section 7. The determination of this question involves a consideration of Sections 1, 7 and 57 of Article IV of the Constitution.

The principal opinion is bottomed on the ruling in State ex rel. Lashly v. Becker, 290 Mo. 560, 235 S. W. 1017. The opinion in the Lashly case and the principal opinion in this case both hold that Section 57 of Article IV not only does not repeal any of the limitations contained in the Constitution, but on the contrary is subject to all limitations contained therein, whether express or implied. This being true, if the proviso contained in Section 7 is a limitation on the legislative power granted to the General Assembly by Section 1, it is not repealed by Section 57. Section 57 is the initiative and referendum amendment to the Constitution and was adopted in 1908. Speaking of this amendment in the Lashly case, supra, we said:

". . . there is no evident intent to be drawn from the amendment of 1908, which would justify the conclusion that it was the purpose of the people to so tear asunder the previous organic law, as to withdraw any restriction upon legislative authority or power. If this amendment withdrew one restriction, it withdrew all, and it is unthinkable to say that such was the intent of the people."

Speaking to this question, the principal opinion in this case says:

"And so the general grant of the legislative authority of the State found in said Section 57 is likewise subject to all the limitations, express or implied, contained in the Constitution; to hold otherwise would be to affirm that the amendment of 1908 repealed practically the whole of the Constitution as it then stood, which of course is unthinkable."

Section 1 of Article IV of the Constitution reads as follows:

"The legislative power, *subject to the limitations herein contained,* shall be vested in a Senate and House of Representatives, to be styled, 'The General Assembly of the State of Missouri.'" (Italics ours.)

By the express terms of this section the people granted to the General Assembly all the legislative power of the State, which includes the power to apportion the State into districts for the election of senators because that is a legislative act. But this power was granted to the General Assembly subject to all limitations contained in other provisions of the Constitution. If Section 1 stood alone the General Assembly would have exclusive and unlimited power to apportion the State into senatorial districts at any time or in any manner it might see fit. But this section must be read in connection with Section 7 of Article IV which deals with the subject of districting the State for the election of senators.

Reading Sections 1 and 7 together, which we must do, the conclusion is irresistible that the provision contained in Section 7 which commands the designated state officers to redistrict the State in event the General Assembly fails or refuses to do so at the time specified in said section, is a clear limitation on the legislative power granted to the General Assembly by Section 1.

Section 1 grants to the General Assembly *all* legislative power of the State, subject to the limitations contained in the Constitution. Absent some limitation on this unqualified grant of power, no agency other than the General Assembly would have power to redistrict the State. Turning to Section 7 we find that it commands the General Assembly to redistrict the State at its first session following each decennial census, and provides that if at any time or from any cause the General Assembly fails or refuses to perform that duty, it shall be performed by the three designated state officials, within thirty

days after the adjournment of the General Assembly. I apprehend no one would contend that the General Assembly has power to redistrict the State during the period of time in which the designated state officers have exclusive authority to do so. The reasonable construction of Sections 1 and 7, when read together, is that the General Assembly is vested with all power to redistrict the State, provided it does so at the time specified in Section 7, but in event it fails or refuses to perform that duty within the time specified, the power to redistrict is taken from it and lodged with the three designated state officials, at least for the period of time specified in said Section 7. There is no dispute about the fact that section one, standing alone, vests in the General Assembly *all* legislative power. The principal opinion in this case so holds. The power to redistrict the State is legislative and is therefore included in the power granted to the General Assembly by this section. If taking the power to redistrict the State from the General Assembly and lodging it with another agency for a limited time at least, as is done by Section 7, does not limit the legislative power granted to the General Assembly by Section .1, I am at a loss to understand what effect it does have on the original grant of power. In my judgment the taking away or suspension of a part of the legislative power granted to the General Assembly by Section 1 amounts to a limitation on the legislative power originally granted.

The principal opinion says the proviso contained in Section 7 is a grant of legislative power. This is begging the question. The issue in this case is whether or not Section 7 is a limitation on the legislative power vested in the General Assembly by Section 1. If it is, the fact that it may also grant legislative power to some other agency, cuts no figure in the case. It must be remembered that Section 1 grants to the General Assembly all legislative power including the power to redistrict the State. The necessary effect of that part of Section 7 which grants to the three designated state officers power to redistrict the State, is to withdraw such power from the General Assembly for a limited time at least. We say this because such power could not at one and the same time be vested in the General Assembly and in the other agency to which Section 7 grants it. The withdrawal of the power to redistrict the State from the General Assembly is a limitation upon its legislative power to the extent of the power withdrawn.

This case may be summed up in a few words. Section 1 grants all legislative power to the General Assembly. Section 7 limits that grant by vesting a part of the legislative power in the designated state officials under the conditions specified in said Section 7. No other conclusion can be reached unless we are willing to say that the legis-

lative power granted to the General Assembly by Section 1 is now as full, complete and unlimited as it would have been had the proviso in Section 7 not been enacted. There is no escape from the conclusion that taking from the General Assembly a part of the legislative authority originally granted to it and depositing it elsewhere, amounts to a limitation on the original grant of authority. You cannot subtract a part from the whole and leave the whole undiminished or without limitation.

It is my judgment that the proviso contained in Section 7 authorizing the designated state officers to redistrict the State in event the General Assembly fails or refuses to do so, is a limitation on the legislative power vested in the General Assembly by Section 1, and being a limitation, on legislative authority, it is not repealed by Section 57. A holding that Section 57 repeals this limitation, amounts to a holding that all limitations contained in the Constitution are repealed.

I cannot lend my concurrence to an opinion which, in my judgment, invalidates all limitations on legislative authority contained in the Constitution, and denies to the citizens of Missouri a right guaranteed to them by the Constitution.

The alternative writ heretofore issued should be quashed. *Atwood, C. J.,* and *Henwood, J.,* concur.