WILLIAM J. CAHILL, JR., ET AL. *v.* ALICE K. LEOPOLD, SECRETARY OF THE STATE OF CONNECTICUT

INGLIS, C. J., BALDWIN, O'SULLIVAN, QUINLAN and WYNNE, JS.

1

Argued December 10, 1953—decided February 15, 1954

*William S. Gordon, Jr.,* with whom were *William P. Aspell* and, on the brief, *George D. Braden, Alex-*

*ander A. Goldfarb, James H. Kinsella, Frederick D. Neusner* and *Leo Parskey,* for the plaintiffs.

*William L. Beers,* attorney general, with whom was *Mansfield D. Sprague,* deputy attorney general, for the defendant.

O'SULLIVAN, J. At its regular session in 1953 the General Assembly enacted Public Act No. 32, purporting to redistrict the senatorial districts of the state. General Statutes, Cum. Sup. 1953, §§ 399c, 400c. The ultimate question in this litigation is whether that enactment is violative of the thirty-first amendment to the state constitution. The amendment, in the form in which it was adopted in 1901 and in which it still remains, is printed in full in the footnote.[2]

[2] "[Amend. XXXI] Section 1. From and after the Wednesday after the first Monday of January, 1905, the senate shall be composed of not less than twenty-four and not more than thirty-six members, who shall be elected at the electors' meetings held biennially on the Tuesday after the first Monday in November.

"Sec. 2. The general assembly which shall be held on the Wednesday after the first Monday of January, 1903, shall divide the state into senatorial districts, as hereinafter provided; the number of such districts shall not be less than twenty-four nor more than thirty-six, and each district shall elect only one senator. The districts shall always be composed of contiguous territory, and in forming them regard shall be had to population in the several districts, that the same may be as nearly equal as possible under the limitations of this amendment. Neither the whole or a part of one county shall be joined to the whole or a part of another county to form a district, and no town shall be divided, unless for the purpose of forming more than one district wholly within such town, and each county shall have at least one senator. The districts, when established as hereinafter provided, shall continue the same until the session of the general assembly next after the completion of the next census of the United States, which general assembly shall have power to alter the same, if found necessary to preserve a proper equality of population in each district, but only in accordance with the principles above recited; after

The case is here upon a reservation, and the facts stipulated by the parties may be summarized as follows: The General Assembly of 1951 convened on January 3 of that year. During the session, it took no action aimed at altering the state senatorial districts. No redistricting bill was introduced in either house. At that time, according to the figures of the 1950 census, the population of the thirty-six senatorial districts varied from 24,309 in the thirty-first to 122,931 in the fifth. As set up in the 1953 act, the population of the districts ranges from 40,835 in the thirty-first to 73,726 in the sixth.

The seventeenth decennial census of the United States was taken as of April 1, 1950. The enumeration started on April 2 and, so far as Connecticut was concerned, was finished by May 1 of that year. It was made by enumerators, to each of whom had been assigned a small district. In addition to making a personal canvass of every household, the enumerators visited hotels and other transient accommodations within their respective districts on April 11 and prepared individual census reports for each person found in the districts on that day whose usual residence was elsewhere. Upon completing their work, the enumerators delivered their returns to field offices, where tabulations were carried out. This field count was completed by the middle of June, 1950, and shortly thereafter the figures for all Connecticut towns were released to and published by the press. Later on, the figures for all cities by wards and voting districts were similarly released and published.

which said districts shall not be altered, nor the number of senators altered, except at a session of the general assembly next after the completion of a census of the United States, and then only in accordance with the principles hereinbefore provided."

About June 25, 1950, the returns for the entire state were shipped to the census office in Philadelphia. These were accompanied by the individual reports of transients found in the state on April 11, 1950. By a method explained in the footnote,[3] tabulation of the data appearing on the returns and reports was commenced in Philadelphia in July. The results were recorded on so-called M.C.D. (minor civil division) sheets.[4] As a consequence of this tabula-

[3] The stipulation of facts reads in part: "In July 1950 a 'hand count' was commenced in Philadelphia. Tabular sheets known as 'minor civil division sheets' or 'M.C.D. sheets' were used as work sheets for this count. The hand count was conducted as follows:

"A. The totals for each enumeration district, obtained by the field count, were inserted in Column 8 of the M.C.D. sheets.

"B. The individual census reports were sorted and allocated to states and then to enumeration districts. It was then ascertained which of the persons listed on individual census reports had already been included on the schedules in their proper enumeration districts as a result of information obtained from others in their households; the individual census reports for these persons were then discarded. The names of persons on individual census reports who had not been enumerated in their proper enumeration districts were then written in on the schedules of such enumeration districts. The total number of names so added in each enumeration district was then inserted in Column 9 of the M.C.D. sheets.

"C. The names on the schedules, including those added from the individual census reports, were then counted and the total for each enumeration district was inserted in Column 2 of the M.C.D. sheets. The figures so inserted in Column 2 were the final figures for the respective enumeration districts.

"D. Enumeration district figures were then subtotalled by enumeration district groupings for incorporated and unincorporated places, wards, voting districts and other subdivisions, and final figures for these subdivisions were inserted in Column 3 of the M.C.D. sheets.

"E. Subdivision figures were then subtotalled, and figures by minor civil divisions were obtained and inserted in Column 3. These were the final figures for Connecticut towns.

"F. The figures for the towns were totalled and the final figures for the counties were obtained. The figures for the eight counties were totalled and the final figure for the state, 2,007,280, was obtained."

[4] The stipulation of facts reads in part: "In Connecticut, the 169

tion, the determination and the recording of the final figures for all Connecticut towns and for wards and voting districts in the cities were completed prior to October 30, 1950.

On the date just mentioned, the director of the census sent to the secretary of commerce a statement showing the total population of the District of Columbia and of each state in the union. On November 2, this information was transmitted to the president and released to the press by the secretary of commerce with the comment: "I am particularly pleased with the speed and accuracy with which the enumeration and final count have been completed. The Bureau finished the job about a month earlier than in 1940."

Section 18 of the current census act authorizes the director of the census to furnish copies of so much of the population returns as may be requested by state or local officials as well as by private individuals. 46 Stat. 25, 13 U.S.C. § 218. By virtue of this provision, certified copies of the final figures of the 1950 census, broken down to Connecticut towns, wards and voting districts, were obtainable, at a cost of $20, any time after October 30, 1950, by Connecticut state officials and by the 1951 General Assembly when it convened.

The final population figures of Connecticut towns, which had been computed and recorded on the M.C.D. sheets prior to October 30, 1950, were first released to the press on August 12, 1951. This release, which did not cover the figures for city wards and voting

towns are known in census terminology as 'minor civil divisions.' The very smallest towns consist of a single enumeration district. In the other towns the enumeration districts are combined into incorporated and unincorporated places and other subdivisions. In the cities, the enumeration districts are combined into wards and voting districts."

districts, included an analysis of the Connecticut population under the heading of urban and rural classifications. On November 28, 1951, the bureau of the census published a pamphlet as a preprint of chapter 7 of an eventually to-be-compiled volume 1 of census statistics. Among other data incorporated in the preprint were the final population figures for counties, towns and wards, where a city was divided into wards.

The original constitutional provision for senatorial districting was embodied in the second amendment,[5] adopted in 1828. This amendment was in substantially the same form as the thirty-first, save that it authorized fewer districts. During 1829, the state was divided by the General Assembly into senatorial districts. From 1831 until 1951, with the exception of the redistricting in 1903 required by the express terms of the thirty-first amendment, every act changing the territorial limits of a senatorial district has been enacted in the year immedi-

[5] "[Amend. II.] The General Assembly, which shall be holden on the first Wednesday of May, in the year one thousand eight hundred and twenty-nine, shall divide the state into districts for the choice of Senators, and shall determine what number shall be elected in each, which districts shall not be less than eight, nor more than twenty-four in number, and shall always be composed of contiguous territory, and in forming them, no town shall be divided, nor shall the whole or part of one county be joined to the whole or part of another county, to form a district; regard being had to the population in said apportionment and in forming said districts, in such manner that no county shall have less than two Senators. The districts, when established, shall continue the same until the session of the General Assembly next after the completion of the next census of the United States; which said Assembly shall have the power to alter the same, if found necessary, to preserve a proper equality between said districts, in respect to the number of inhabitants therein, according to the principles above recited; after which, said districts shall not be altered, nor the number of Senators altered, except at any session of the General Assembly next after the completion of a census of the United States, and then only according to the principles above prescribed."

ately following the year of the decennial census, that is, in 1831, 1841, 1881, 1921 and 1941. During the same period, each General Assembly held in the first year after a census has considered redistricting legislation except the Assemblies of 1891 and 1951. In each of the years in which such legislation was considered, there were available to the General Assembly only the preliminary figures issued by the official charged with taking the census. In 1911 Governor Simeon E. Baldwin procured the final census figures prior to publication and submitted them to the General Assembly. Several of the governors holding office in the first year after a census have called the attention of the General Assembly to the fact that it was proper to redistrict the state and have observed that if it were not done then, it could not be done for another ten years.

From 1903 to 1953, the senatorial districts have been altered twice. In 1921 changes were made in the districts in the city of New Haven, and in 1941 the town of Greenwich was constituted an additional district. Certain other stipulated facts need not be recited at this point but will subsequently be mentioned in discussing the law.

The nine specific questions[6] propounded on this reservation can be resolved, as the parties agree, in-

[6] "1. Was the 1951 Session of the General Assembly a session of the General Assembly next after the completion of a census of the United States, within the meaning of Section 2 of Article XXXI of the Amendments to the Constitution of Connecticut?

"2. Was the 1953 session of the General Assembly a session of the General Assembly next after the completion of a census of the United States, within the meaning of Section 2 of Article XXXI of the Amendments to the Constitution of Connecticut?

"3. Did the General Assembly of 1953 have power to alter the state senatorial districts?

"4. If the answer to question 3 is in the affirmative, are the districts as defined in Public Act No. 32, Public Acts of 1953, composed

to the following three: (1) Was the seventeenth census of the United States completed, within the meaning of the thirty-first amendment to the state constitution, before the opening of the regular session of the General Assembly in January, 1951? (2) If it was, did the thirty-first amendment preclude the General Assembly of 1953 from enacting redistricting legislation? (3) If the General Assembly of 1953 did in fact have the power to redistrict, did the redistricting act of 1953 violate the constitutional requirement that each senatorial district shall be composed of contiguous territory?

We begin a discussion of the first of these three questions by observing that, when the constitutionality of a legislative enactment is attacked, we must make every reasonable intendment in favor of its validity. *Northeastern Gas Transmission Co.* v. *Collins,* 138 Conn. 582, 586, 87 A.2d 139; *Legat* v. *Adorno,* 138 Conn. 134, 145, 83 A.2d 185. On the other

---

of contiguous territory, within the meaning of Section 2 of Article XXXI of the Amendments to the Constitution of Connecticut?

"5. Did the approval by the electors of the State on June 22, 1953 of the amendments incorporating the 47 amendments into the Constitution have the effect of continuing the senatorial districts as defined in Section 990 of the General Statutes, Revision of 1949, until the session of the General Assembly next after the completion of the 1960 census of the United States?

"6. From and after the Wednesday after the first Monday of January 1955, will the state senatorial districts be as defined under Section 990 of the General Statutes, Revision of 1949, or as defined under Public Act No. 32, Public Acts of 1953?

"7. From and after the Wednesday after the first Monday of January 1955, what will be the legal territorial limits of the senatorial district of which the town of Meriden is a part?

"8. From and after the Wednesday after the first Monday of January 1955, what will be the legal territorial limits of the senatorial district of which the town of Windsor is a part?

"9. From and after the Wednesday after the first Monday of January 1955, what will be the legal territorial limits of the senatorial district of which the town of Beacon Falls is a part?"

hand, we must not be blind to the obvious or permit ourselves to be lulled into error by the soothing influence of a mere presumption. If the invalidity of the enactment is evident beyond a reasonable doubt, our duty, delicate as the task may be, is to nullify the statute. *Gionfriddo* v. *Windsor,* 137 Conn. 701, 705, 81 A.2d 266; *Beach* v. *Bradstreet,* 85 Conn. 344, 349, 82 A. 1030.

The thirty-first amendment (§ 2) provides that the senatorial districts, after they have once been established, "shall not be altered . . . except at a session of the general assembly next after the completion of a census of the United States." The initial inquiry which this language naturally suggests is: What is meant by the phrase "the completion of a census"? A census is the official enumeration of the population. Webster's New International Dictionary (2d Ed.); *City of Compton* v. *Adams,* 33 Cal. 2d 596, 597, 203 P.2d 745; *City of Huntington* v. *Cast,* 149 Ind. 255, 258, 48 N.E. 1025. In ordinary parlance, the completion of a census refers to the time when an official counting of the people has been finished. But, as used in the thirty-first amendment, the phrase means something more than that. The "census" mentioned in the amendment must of necessity be one showing the figures which are essential for intelligent action on the part of the General Assembly. The mere enumeration of the entire state, without more, is of no help in the enactment of redistricting legislation. The Assembly needs other data if, as provided, it is to make the senatorial districts as nearly equal in population as possible, under the limitation prescribed in the amendment. A census, then, within the thirty-first amendment, is one showing the population figures broken down into counties, towns and wards; and the census is

completed only when those figures have been released to the public by an official authorized by law to make such publication or when those figures are available for the use of the General Assembly.

This standard for determining when a census has been completed accords with common sense and fulfils the purpose for which the phrase under discussion was incorporated into the amendment. That purpose was not only to establish the time when senatorial redistricting is authorized but also to provide the General Assembly with sufficient data to pass legislation upon the subject, if it desires to do so. The defendant appears to concede this. In his brief he states that "[w]hether or not the census was completed in 1950 in the sense the word is used in the 31st Amendment to our Constitution depends upon whether there was available the information needed to carry out a redistricting of the Senate in this state." He maintains, however, that such information was not available until November 28, 1951, when the final results of the tabulation of Connecticut counties, towns and wards appeared in a printed booklet issued by the director of the census. The defendant takes this position in spite of the fact, which he readily concedes, that the identical information found in the booklet was, upon the payment of $20, available to Connecticut officials at any time after October 30, 1950, and to the General Assembly when it convened in January, 1951.

But this aside, it is not necessary that the information be published in book form before it becomes officially available. Indeed, there is not even a constitutional provision requiring the figures to be final. While final tabulations tend to greater exactitude than those previously computed, there is no need for the precision of perfection. The results of

the preliminary counts customarily released by the census bureau, as happened in the case at bar, are ample to afford sufficiently accurate data for an Assembly to proceed to redistrict in an intelligent manner, provided the counts have been broken down into counties, towns and wards. The situation would be vastly different were senatorial districts to be absolutely equal in population. That requirement is not to be found in the amendment. The General Assembly is commanded to equate the districts as nearly as possible. In view of the provisions that each county shall have at least one senator, that no district shall cross county lines and that no town shall be divided unless for the purpose of forming more than one district wholly within such town, equality is impossible. The population in the districts established by the act of 1953 runs from 40,835 to 73,726. If the use of the final figures which were before the 1953 Assembly could bring about no greater equality than that shown by the range of population just noted, the needlessness of requiring final rather than preliminary figures becomes perfectly apparent.

Then again, our acceptance of the defendant's claim that no census is completed, within the intendment of the thirty-first amendment, until the enumeration has been tabulated by towns and wards into "final" figures would force us into the unhappy holding that each General Assembly which enacted redistricting legislation prior to 1950 did so in violation of law. This conclusion would be inevitable, since every such Assembly acted only on preliminary figures. Indeed, if the redistricting legislation after the 1880 census had had to await the release of "final" figures in pamphlet form by the census director, the first Assembly qualified to act

would have been that of 1889, because the final figures of the 1880 census were not officially released until 1888. The framers of the constitutional amendments in question would undoubtedly be the first to disclaim a construction of their language which would lead to such an anomalous result.

Furthermore, this claim that the information must be in book form and must be based upon final tabulations is contrary to the construction given for almost 125 years to the phrase "the completion of a census" by the legislative and executive branches of the state government. Those branches have uniformly looked upon the census as completed when the preliminary count was available, and, on every occasion when redistricting was accomplished or considered, such action was taken far in advance of final publication. Of the many instances of legislative construction referred to in the footnote,[7] only one will be mentioned. The first census after the

---

[7] The enumerations of 1830 to 1870 inclusive were conducted by the United States marshals. The General Assemblies of 1831 and of 1841 enacted redistricting legislation; those of 1851, 1861 and 1871 considered such legislation but rejected it. In each of the five instances, only the preliminary figures of the marshal were available to the Assembly. The final figures for the censuses of 1830, 1840, 1850, 1860 and 1870 were not published until 1832, September 1, 1841, 1853, 1864 and September, 1871, respectively.

Beginning in 1880, the taking of the census was carried out, as it still is, by enumerators and field supervisors acting under the guidance of the director of the census bureau. The General Assemblies of 1881, 1901, 1911, 1921, 1931 and 1941 considered redistricting legislation, but enactments were passed only by the Assemblies of 1881, 1921 and 1941. Only preliminary figures were available for the Assemblies of 1881 and 1901. The final figures of the 1880 and 1900 census were published in 1888 and late in 1901, respectively. Final figures were available to the Assembly of 1911, upon Governor Baldwin's obtaining them, upon request, from the census bureau. These figures were not published until late in 1911 and 1912.

adoption of the second amendment (the forerunner
of the thirty-first) was taken in 1830. The 1831 ses-
sion of the General Assembly convened on the first
Wednesday of May in that year. That Assembly
passed an act which for the first time made a change
in the division of the state into senatorial districts.
When the Assembly convened, as well as at the time
of the passage of the act, only the uncorrected re-
turns of the census were available. It was not until
1832 that the final figures of the 1830 census were
first published. In the 1831 General Assembly were
undoubtedly many of the legislators who had served
in the sessions of 1827 and 1828, when the resolu-
tions leading to the adoption of the second amend-
ment were debated and passed. If the phrase "the
completion of a census" embodied in the second
amendment was intended to require the final tabu-
lations of the census returns, it is difficult to con-
ceive that those men either overlooked or, worse
still, ignored the constitutional mandate they had
helped to frame. *Water Commissioners* v. *Curtis,*
87 Conn. 506, 511, 89 A. 189. A practical construc-
tion placed upon a constitutional provision immedi-
ately after its adoption and consistently and re-
peatedly followed by the executive and legislative
branches for over a century thereafter is most per-
suasive. Ibid. In the case at bar, it furnishes
strong evidence of the meaning to be accorded the
phrase. A practice of such duration, while not ab-
solutely binding, is entitled to great regard in deter-
mining the true construction of the constitutional
provision. *State ex rel. Corbett* v. *South Norwalk,*
77 Conn. 257, 264, 58 A. 759. The point need not
be further labored other than to invite attention to
instances of executive branch construction, some of
it by governors who were eminent lawyers and for-

mer members of this court, as cited in the footnote.[8]

That the census was completed within the meaning of the thirty-first amendment is likewise supported by the law of other jurisdictions. None of the cases to which our attention has been called involves a construction of the identical phrase, "the completion

[8] On May 5, 1841, when only the preliminary figures were available, Governor Ellsworth said in his inaugural address: "A new census of the people of Connecticut has been completed." The final figures were not published until September 1, 1841.

On May 16, 1871, when only the preliminary figures were available, Governor Jewell, in his inaugural address, stated that the census of 1870 "has been taken" and that the General Assembly should consider redistricting legislation. The final figures were not published until after the Assembly had adjourned.

On January 5, 1881, when only the preliminary figures were available, Governor Bigelow said in his inaugural address: "[T]he completion of the enumeration [of the 1880 census] . . . bring[s] to your consideration the subject of re-apportionment of the senatorial districts. . . ." The final returns were not published until 1888.

To similar effect have been rulings of several attorneys general.

On January 23, 1911, Attorney General Light advised Governor Simeon E. Baldwin that "[a]ny census of the United States . . . may be said to be completed when the last name has been enumerated and registered. I am informed that this was done before January 1st, 1911. So the needed information is obtainable by the present General Assembly, and it is not necessary to wait till the material has been put into book form and published." For an opinion to like effect, given on November 6, 1940, by Attorney General Pallotti, see 21 Conn. Atty. Gen. Rep. 706.

In 1950, Attorney General Hadden advised the secretary of state that "changes in population, for the purpose of additional representation in the House of Representatives under Article XV of the Amendments to the State Constitution may be ascertained by the executed certificate or report of the [field] supervisor of census." On the basis of the preliminary figures of the 1950 census, various towns were permitted to elect additional representatives.

On April 27, 1951, Attorney General Conway ruled that "[i]t is evident that the decennial census taken in 1950 was completed on October 1, 1950." At that time, only preliminary figures were available.

On January 5, 1953, Attorney General Conway advised Governor Lodge that the 1950 census was completed before November 5, 1950, although only preliminary figures were then available.

of a census," found in our constitutional amendment. The state courts have been usually asked to construe such language as "according to the last census." In doing so, they referred to the time when a census had been completed and in this manner discussed the matter as though they were in fact construing the phrase "the completion of a census."

For example, a case frequently cited on this subject is *Holcomb* v. *Spikes,* 232 S.W. 891 (Tex. Civ. App.). The Texas constitution provided that "counties having 10,000 inhabitants, to be determined by the last preceding census of the United States," might elect a tax collector. Under the 1910 census, Lubbock County had a population of less than 10,000. On September 30, 1920, the director of the census certified that "according to a preliminary count, subject to correction," the population of the county was 11,096. On November 2, 1920, Spikes was elected tax collector. Holcomb challenged the legality of the election on the ground that the census of 1910 should govern, since the figures of the 1920 census were not final or complete. The court held (p. 894) that the election of Spikes on the basis of the preliminary count of the 1920 census was valid. To like or analogous effect are *Garrett* v. *Anderson,* 144 S.W.2d 971, 973 (Tex. Civ. App.); *Herndon* v. *Excise Board of Garfield County,* 147 Okla. 126, 128, 295 P. 223; *Excise Board, Washita County* v. *Lowden,* 189 Okla. 286, 287, 116 P.2d 700; *State* v. *Braskamp,* 87 Iowa 588, 592, 54 N.W. 532; see also *Twin Falls* v. *Koehler,* 63 Idaho 562, 567, 123 P.2d 715. The only case which superficially appears to be opposed to the holding of *Holcomb* v. *Spikes,* supra, is *Childers* v. *Duvall,* 69 Ark. 336, 338, 63 S.W. 802. The following are clearly distinguishable: *Huntington* v. *Cast,* 149 Ind. 255, 48 N.E. 1025; *Wolfe* v.

*Moorhead,* 98 Minn. 113, 107 N.W. 728; *Lewis* v. *Lackawanna County,* 200 Pa. 590, 50 A. 162; *Greenough* v. *Town Council of Narragansett,* 29 R.I. 380, 71 A. 594.

Thus, on the basis of a construction that serves the purpose for which the phrase "the completion of a census" was incorporated into the second and thirty-first amendments, on the basis of the legislative and executive construction given to the phrase for 125 years, on the basis of the conceded facts, and on the basis of the precedents of other jurisdictions, it is clear that the 1950 census was completed, within the meaning of those amendments, by October 30, 1950.

We now turn to the second of the three questions previously mentioned: If the census was completed in 1950, did the thirty-first amendment preclude the General Assembly of 1953 from enacting redistricting legislation in the form of Public Act No. 32? In maintaining that the question should be answered in the negative, the defendant states his position in this manner: "The General Assembly is vested with the power to alter the senatorial districts when it is found necessary to secure proper equality of population subject to constitutional restrictions. There rests upon the General Assembly the duty to exercise this power for the people of the state. This power is to be exercised at the first session following the federal census and, if not so exercised, continues in full force to succeeding sessions until [it is] exercised." This amounts to saying that, even if the 1951 Assembly was "next after the completion of a census," the 1953 Assembly could still act because of a continuing duty imposed upon it after the 1951 Assembly failed to consider redistricting legislation. The theory is not applicable, however, to the case

at bar. To adopt it would require us to find ambiguity where none exists, to warp the language of the thirty-first amendment, to ignore its obvious meaning and the purpose of its framers, and to disregard the practical construction given to it for over a century by both the legislative and executive branches of government.

An analysis of both the second and the thirty-first amendments discloses that each sets forth a duty, a power and a prohibition. Thus, the second amendment provides, in language of clear command, that the General Assembly of 1829 *"shall* divide the state into districts"* (italics supplied). This created a positive duty. The amendment then provides that "[t]he districts, when established, shall continue the same until the session" of the 1831 General Assembly, which *"shall have the power* to alter the same, if found necessary, to preserve proper equality between said districts"* (italics supplied). This was a grant of power. Then, as if anticipating such a claim as that now advanced by the defendant, the framers of the amendment concluded with the provision that, "after [1831], said districts *shall not be altered, . . .* except at any session of the General Assembly next after the completion of a census of the United States . . ." (italics supplied).

In similar manner and in almost identical language, the thirty-first amendment imposes a duty upon the General Assembly of 1903 to divide the state into senatorial districts, grants the General Assembly of 1911 the power to alter them, and prohibits their alteration thereafter "except at a session of the general assembly next after the completion of a census of the United States."

It was not by sheer accident that each amendment imposed a duty upon the first Assembly following

the adoption of the amendment, granted a power to the Assembly convening next after the completion of the federal census, and set up a prohibition against action on the part of every other Assembly. The meticulous choice of language and the manner in which the duty, the power, and the prohibition are physically segregated in the phraseology of the amendment lead logically to no other conclusion than that the framers were speaking with studied deliberation and after thorough consideration.

Dealing, as we are, with constitutional amendments, we must assume that infinite care was employed to couch in scrupulously fitting language a proposal aimed at changing the organic law of the state. 1 Cooley, Constitutional Limitations (8th Ed.) p. 125. Undoubtedly this was particularly true because of the contemplated change in the method of electing the state senate, since this was a subject of great concern and of wide discussion during the 1820's. Under the constitution of 1818, senators had been elected at large. Conn. Const. Art. III § 4 (1818). The purpose of the second amendment, the prototype of the thirty-first, was to provide representation in the senate in proportion to the population. The senate was to be composed, under the second amendment, of senators from not less than eight nor more than twenty-four districts and, under the thirty-first, of senators from not less than twenty-four nor more than thirty-six districts. Since changes in the population might make the districts unequal as they were established by the Assemblies of 1829 and 1903, the framers devised the plan of affording to the General Assembly a periodic opportunity to re-examine and redistrict, if found necessary, in order to adjust, as best could be done, existing inequalities. That power was given to the

Assembly next convening after the completion of the census. The amendments recite that the Assembly "shall have the power" to redistrict; they do not provide, as the defendant insists, that the Assembly "shall redistrict" or "shall have the duty" of doing so. The language of the amendments establishes that no duty to redistrict was imposed on those Assemblies convening next after a federal census had been completed.

But, it is urged, if such a General Assembly should fail, as occurred in 1951, to take any action to adjust inequalities in the various districts, grave injustice might be done the people of the state. That is entirely beside the point. We are not passing upon the injustice, if such it was, wrought by the neglect, if any, of the Assembly of 1951 to act. It may be, as was recently pointed out by a committee of distinguished members, including a former chief justice of this court, that the thirty-first amendment should be altered in order to compel redistricting after each federal census.[9] Our concern, however, is here limited to the meaning of a constitutional provision and not to the desirability of a constitutional amendment.

[9] In October, 1950, a committee of judges and lawyers filed a report with the State Bar Association on a proposal for a new state constitution. Referring to provisions concerning the senate, they said: "The principal change suggested is one which *compels* a redistricting for the Senate after each federal census [italics supplied]. An amendment to our constitution adopted in 1903 required this to be done at that time but merely gave the General Assembly power to redistrict after subsequent censuses, such action to be taken at the session next after the completion of the census. . . . Your Committee . . . believes strongly that the constitution should contain a provision for a compulsory redistricting for the Senate after each federal census." Report of the Special Committee to Study Chapter X (Strengthening the Constitution) of the Report of the Commission on State Government Organization (Wm. M. Maltbie, Wm. A. Bree, David S. Day, Jonathan F. Ells, Charles V. James, John Q. Tilson), 24 Conn. B.J. 484, 487.

Accordingly, we conclude that the language of the thirty-first amendment granted a power but imposed no duty to redistrict upon the Assembly of 1951. Once this conclusion is reached, the defendant's position collapses. Obviously, there could have been no continuing duty in the Assembly of 1953 unless there was an initial duty in the Assembly of 1951.

This conclusion is fortified by two other considerations, to which we briefly refer. In the first place, if the Assembly of 1951 was burdened with a duty to redistrict which it failed to honor, and if a continuing duty was thereafter imposed upon the Assembly of 1953, we would be obliged to hold that the last part of the amendment, creating the prohibition, is mere surplusage. This, of course, cannot be done. Effect must be given to every part of and each word in our constitution, unless there is some clear reason, not here discernible, for not doing so. *Williams* v. *United States,* 289 U.S. 553, 573, 53 S. Ct. 751, 77 L. Ed. 1372; 11 Am. Jur. 665; see *General Motors Corporation* v. *Mulquin,* 134 Conn. 118, 126, 55 A.2d 732; *Fenwick* v. *Old Saybrook,* 133 Conn. 22, 28, 47 A.2d 849.

In the second place, the legislative and executive departments have, until 1953, unvaryingly construed the second and the thirty-first amendments as limiting redistricting to the first Assembly convened after the completion of the census. Examples of this construction will be found in the footnote.[10] As was stated above, in discussing the first question, as to the completion of the census, this time-honored

---

[10] When Governor Ellsworth delivered his inaugural address in 1841, he told the General Assembly that "so often as a new census of the United States is taken, the Assembly is *authorized* to make alterations in senatorial districts" (italics supplied).

In 1871, Governor Jewell stated that "[t]he session of the general assembly succeeding the decennial census is designated by the consti-

construction points forcibly to the true meaning which the framers of the amendments intended each to have. *Water Commissioners* v. *Curtis,* 87 Conn. 506, 511, 89 A. 189; *State ex rel. Corbett* v. *South Norwalk,* 77 Conn. 257, 264, 58 A. 759; 1 Cooley, Constitutional Limitations (8th Ed.) p. 144 et seq.

It was not until January, 1953, that the theory of a continuing duty appears to have ever been mentioned by any official in connection with the construction of either amendment. The theory was advanced by the attorney general in a letter addressed to the governor's office. Apparently on the basis of this letter, the General Assembly of 1953, in enacting Public Act No. 32, devoted the first section to the legislative findings, purpose and policy.[11] Cum. Sup.

tution as *the only one* in which the senatorial districts may be altered" (italics supplied).

In 1911, Governor Simeon E. Baldwin stated to the General Assembly that "it will be necessary to redistrict the State, if it is to be redistricted, at this session; as no other General Assembly will have power to redistrict until 1921."

In 1941, the Commission on Election Laws reported that "[t]he provisions of our state constitution are such that state senatorial districts can be changed now; yet if this session of the General Assembly fails to change them they cannot be altered for another decade unless the constitution is changed in the meantime." Rep. Election Laws Comm. (1941) p. 23.

In 1946, the Legislative Council reported: "Article XXXI of the Amendments to the Constitution permits reapportionment only at the session of the legislature immediately following each federal census. Thus if the session of 1951 passes without reapportionment, there can be no reapportionment of senate seats until 1961." Rep. Legis. Council (1946) p. 31.

In 1951, Governor Lodge in his inaugural message said to the General Assembly: "If we do not redistrict during this session, we cannot, under our constitution, do so until 1961." Conn. H. Jour., 1951 Sess., p. 42.

[11] "Section 1. LEGISLATIVE FINDINGS, PURPOSE AND POLICY. There has been no general redistricting of the senate by the general assembly for half a century. The failure of the general assembly to act is in contravention of the mandate of section 2, Article XXXI,

1953, § 399c. Strangely enough, the legislative pronouncement, incorporated in the first section of the act, that a "continuing duty" rested upon the Assembly of 1953 tends to support a construction of the amendments quite to the contrary of the one promulgated in the public act. For, if the continuing duty existed in 1953, it has always existed. A constitutional provision cannot mean one thing today and, through the application of some newly devised theory, a different thing fifty years hence. 1 Cooley, op. cit., p. 123. To adopt the defendant's theory would require us to attribute to the framers of the second amendment an intention to create a continuing duty. If we take that ground, then we must also attribute to them an intellectual inability to express themselves in adequate language to accomplish that result—and this we refuse to do. The long lapse of time and the unnecessary incorporation into the enactment of 1953 of a legal conclusion as to a "continuing duty" in the face of a uniform construction to the contrary by former Assemblies for over a century speak eloquently of the futility of attempting to establish, by legislative fiat, a constitutional duty when none has ever before been claimed to have existed. The declaration in § 1 of Public Act No. 32 that a continuing duty has been created by the thirty-first amendment has, under the circumstances, no effect upon the established and proper construction of the amendment.

The defendant has cited several cases in other

of the amendments to the Connecticut constitution. *The constitutional mandate is a continuing one and the general assembly is under a continuing duty to perform its obligation* [italics supplied]. The populations of the several districts are grossly disproportionate as a result of which representation in the state senate is inequitable. It is therefore necessary to alter the districts in order to preserve a proper equality of population in each district."

jurisdictions to support his theory of a continuing duty. The language of the thirty-first amendment is so unique that those cases have little, if any, value. Our amendment is unique in two respects: first, it contains no language of command other than that directed to the year 1903 but is, on the other hand, expressed in language of absolute prohibition; and secondly, the inclusion of the words "if found necessary" emphasizes the absence of a duty. None of the following cases cited by the defendant or discovered by us construes a constitutional provision in which there is a prohibition and no command, or a constitutional provision including language equivalent to the words "if found necessary." *In re Legislative Apportionment,* 12 Colo. 186, 21 P. 480; *People ex rel. Mooney v. Hutchinson,* 172 Ill. 486, 50 N.E. 599; *Denney v. State ex rel. Basler,* 144 Ind. 503, 42 N.E. 929; *Opinion of the Justices,* 254 Mass. 617, 151 N.E. 680; *W.R. Reynolds & Co. v. Secretary of State,* 238 Mich. 552, 213 N.W. 707; *State ex rel. Meighen v. Weatherill,* 125 Minn. 336, 147 N.W. 105; *State ex rel. Gordon v. Becker,* 329 Mo. 1053, 49 S.W.2d 146; *Botti v. McGovern,* 97 N.J.L. 353, 118 A. 107; *Matter of Reynolds,* 202 N.Y. 430, 96 N.E. 87; *Jones v. Freeman,* 193 Okla. 554, 146 P.2d 564; *Noecker v. Woods,* 259 Pa. 160, 102 A. 507; *Opinion of the Judges,* 61 S.D. 107, 246 N.W. 295; *State ex rel. Attorney General v. Cunningham,* 81 Wis. 440, 51 N.W. 724. The constitutional provisions construed in these cases are noted below at length.[12] To

---

[12] (Italics in the following constitutional provisions are supplied.)

COLORADO. Art. V § 45 (1876). "The general assembly shall provide by law for an enumeration of the inhabitants of the State in the year of our Lord 1885, and every tenth year thereafter; and at the session next following such enumeration, and also at the session next following an enumeration made by the authority of the United States, *shall* revise and adjust the apportionment for senators and representa-

attempt to analyze all of these cases is unnecessary. A reading of the provisions is ample to show the lack of similarity with those of our amendment. We conclude that the amendment does not provide for a continuing duty. See *State ex rel. Morris* v. *Bul-*

tives on the basis of such enumeration, according to ratios to be fixed by law."

ILLINOIS. Art. IV § 6 (1870). "The General Assembly *shall* apportion the state every 10 years, beginning with the year 1871, by dividing the population of the state, as ascertained by the federal census, by the number 51, and the quotient shall be the ratio of representation in the senate."

INDIANA. Art. IV § 5 (1881). "The number of Senators and Representatives *shall*, at the session next following each period of making such enumeration, be fixed by law, and apportioned among the several counties, according to the number of male inhabitants above twenty-one years of age, in each . . . ."

MAINE. Art. IV, Pt. 2, § 2 (1819). "The Legislature, which shall be first convened under this Constitution, *shall*, on or before the fifteenth day of August in the year of our Lord one thousand eight hundred and twenty-one, and the Legislature at every subsequent period of ten years, cause the State to be divided into districts for the choice of senators."

MASSACHUSETTS. Art. of Amend. XXII (1857). "The general court *shall*, at the first session after each next preceding special enumeration, divide the commonwealth into forty districts of adjacent territory . . . ."

MICHIGAN. Art. V § 4 (1908). "At the session in 1913, and each tenth year thereafter, the legislature *shall* by law rearrange the senatorial districts and apportion anew the representatives among the counties and districts according to the number of inhabitants, using as the basis for such apportionment the last preceding United States census of this state."

MINNESOTA. Art. IV § 23 (1857). "At their first session after each enumeration so made, and also at their first session after each enumeration made by the authority of the United States, the legislature *shall have the power* to prescribe the bounds of congressional, senatorial and representative districts, and to apportion anew the senators and representatives among the several districts. . . ." (While the phrase "shall have the power" is identical with that in our amendment, and would appear to present a situation analogous to that in the case at bar, the result reached by the Minnesota court is distinguishable, since the Minnesota constitution is, unlike ours, a limitation of power, and furthermore, unlike ours, does not incorporate the

*keley,* 61 Conn. 287, 367, 23 A. 186. In view of our discussion of the first two questions, it is unnecessary for us to answer the third.

---

words "if found necessary" directly after the phrase "shall have the power.")

MISSOURI. Art. IV § 7 (1875). "Senators and Representatives shall be chosen according to the rule of apportionment established in this Constitution, until the next decennial census by the United States shall have been taken, and the result thereof as to this State ascertained, when the apportionment *shall* be revised and adjusted on the basis of that census, and every ten years thereafter . . . such apportionment to be made at the first session of the General Assembly after each such census . . . ."

NEW JERSEY. Art. IV § 3 (1844). "The present apportionment shall continue until the next census of the United States shall have been taken, and an apportionment of members of the general assembly *shall* be made by the legislature, at its first session after the next and every subsequent enumeration or census, and when made shall remain unaltered until another enumeration shall have been taken . . . ."

NEW YORK. Art. III § 4 (1895). ". . . and the said districts *shall* be so altered by the legislature at the first regular session after the return of every enumeration, that each senate district shall contain as nearly as may be an equal number of inhabitants . . . ."

OKLAHOMA. Art. V § 10b (1907). "The apportionment of this State for members of the Legislature *shall* be made at the first session of the Legislature after each decennial Federal census."

PENNSYLVANIA. Sec. 14, Schedule of the Pennsylvania Constitution (1874). "The General Assembly *shall*, at the next succeeding session after each decennial census and not oftener, designate the several judicial districts, as required by this constitution."

SOUTH DAKOTA. Art. III § 5 (1889). "The legislature shall provide by law for the enumeration of the inhabitants of the state in the year one thousand eight hundred and ninety-five and every ten years thereafter; and at its first regular session, after each enumeration and also after each enumeration made by authority of the United States, but at no other time, the legislature *shall* apportion the senators and representatives . . . ."

WISCONSIN. Art. 4 § 3 (1848). "The legislature shall provide by law for an enumeration of the inhabitants of the state, in the year one thousand eight hundred and fifty-five, and at the end of every ten years thereafter; and at their first session after such enumeration, and also after each enumeration made by the authority of the United States, the legislature *shall* apportion and district anew the members of the senate and assembly . . . ."

To the nine specific questions, our answers are as follows: "Yes" to question 1 and "No" to questions 2 and 3. All other questions need not be answered.

No costs will be taxed in this court to any party.

In this opinion QUINLAN and WYNNE, Js., concurred.

INGLIS, C. J. (dissenting). I am unable to agree with the majority of the court either in their conclusion that the "completion" of the seventeenth census occurred prior to the opening of the 1951 session of the General Assembly or in their conclusion that the thirty-first amendment precludes redistricting by any session of the General Assembly except the one next after the completion of a census.

The thirty-first amendment provides that the senatorial districts, after they are once established, "shall not be altered, nor the number of senators altered, except at a session of the general assembly next after the completion of a census of the United States." The first question with which we are faced, therefore, is what is meant by the phrase "the completion of a census" as it is used in the amendment. In the consideration of this question it must be borne in mind that every reasonable intendment must be made in favor of the legislative enactment. If the constitution is reasonably open to a construction which will make a statute valid, it must be given such a construction. *Northeastern Gas Transmission Co.* v. *Collins,* 138 Conn. 582, 586, 87 A.2d 139; *Legat* v. *Adorno,* 138 Conn. 134, 145, 83 A.2d 185; *Lyman* v. *Adorno,* 133 Conn. 511, 514, 52 A.2d 702.

It is obvious that the "census" referred to in the amendment is one which shows the detail of all figures requisite for an intelligent division of the state into senatorial districts. Inasmuch as no one

of those districts may overlap county lines and any one may be a subdivision of a city or town, and inasmuch as, in the formation of the districts, their populations must be as nearly equal as possible, the population figures must be for the whole state broken down into counties, towns and wards. A census to be complete for the purposes of redistricting must be one which shows such figures.

With this much, I apprehend, the majority of the court agree. The differences between us on this phase of the case arise by reason of the difficulty in fixing the date at which so much of the seventeenth census as set forth such figures was completed. The majority opinion seems to fix two possible dates. One of these is October 30, 1950, when, as now appears from the statement of the director of the census, the census was complete, and after which the governor could have obtained the population figures. The difficulty with accepting this date is that there was not, at that time, any official publication of the fact that the necessary figures were then available, and therefore no one in our state government was chargeable with notice to that effect. Most of the argument of the majority seems to be directed to the conclusion that preliminary figures were all that was necessary and that therefore the census was completed when those figures were published. It seems to me that this conclusion is untenable because basing a redistricting upon preliminary figures involves the risk that inaccuracies may creep in and produce an unequal division of the districts. As a matter of fact, as will be pointed out in detail later on, there was no official announcement of even preliminary population figures broken down into wards until long after the opening of the 1951 session of the General Assembly. It is true that pre-

liminary figures based on the field count were re-
leased to the press by local supervisors in June,
1950, but they could not have been official because
under the federal law the only person authorized to
issue bulletins is the director of the census himself.
Even if there had been an official announcement,
however, it seems to me clear that it could not have
marked the completion of the census. I take it that
it is axiomatic that nothing is completed until it is
in its final form. The completion of the tabulation
and the announcement of preliminary figures clearly
were not the completion of the census in its final
form. My position is that the seventeenth census
was not completed until November, 1951. My rea-
sons for arriving at that conclusion follow.

A census is the official enumeration of the popula-
tion. Webster's New International Dictionary (2d
Ed.). But as used in a constitutional provision
such as that before us it connotes something more than
that. It would be of no avail to the General Assembly
in enacting a redistricting if the census went no
further than the mere enumeration or, even if the
data obtained in the enumeration had been tabulated,
the tables were locked up somewhere in Philadelphia
or Washington and not available to the public. The
word "census" as used in the thirty-first amendment,
therefore, connotes an official record of the enumer-
ation to which access may be had by the public and
upon which reliance may be placed. Accordingly,
for the purposes of redistricting, a census is com-
pleted only when the population figures obtained in
the enumeration have been finally tabulated by coun-
ties, towns and wards and the results of that tabu-
lation have been released to the public by an official
authorized by law to make such publication. In this
practically all of the authorities, so far as I have

been able to seek them out, are agreed. *Childers* v. *Duvall,* 69 Ark. 336, 338, 63 S.W. 802; *Huntington* v. *Cast,* 149 Ind. 255, 258, 48 N.E. 1025; *State* v. *Braskamp,* 87 Iowa 588, 591, 54 N.W. 532; *Wolfe* v. *Moorehead,* 98 Minn. 113, 116, 107 N.W. 728; *Lewis* v. *Lackawanna County,* 200 Pa. 590, 597, 50 A. 162; *Greenough* v. *Town Council of Narragansett,* 29 R.I. 380, 382, 71 A. 594; *Nelson* v. *Edwards,* 55 Tex. 389, 392; 14 C.J.S. 103, § 6. There are two jurisdictions in which cases seem to hold that for reapportionment purposes the census figures may be merely preliminary, but even then they must have been made public by a duly authorized official. *Herndon* v. *Excise Board of Garfield County,* 147 Okla. 126, 127, 295 P. 223; *Ervin* v. *State,* 119 Tex. Crim. 204, 208, 44 S.W.2d 380; *Holcomb* v. *Spikes,* 232 S.W. 891, 893 (Tex. Civ. App.). The only case coming to my attention which holds that a census is complete when the enumeration is finished and before it is officially published is *Twin Falls* v. *Koehler,* 63 Idaho 562, 567, 123 P.2d 715.

It is true that in the past the General Assembly, in redistricting the state, has acted upon preliminary census returns. The plaintiffs contend that this constitutes a contemporary and practical construction made by state officials which should now control the interpretation of the constitutional provision in question. Granted that it should be given weight, it must be remembered that the particular question now before us has never before been brought in issue and, in any event, contemporary construction of a constitutional provision " 'can never abrogate the text, . . . it can never narrow down its true limitations, it can never enlarge its natural boundaries.' " *Borino* v. *Lounsbury,* 86 Conn. 622, 625, 86 A. 597. In the present case, the meaning of "completion" of the

census as used in the thirty-first amendment is so clear that common practice giving it a different meaning, when no one raised a question about it, ought not to be allowed to override it.

The federal law governing the taking of the seventeenth census fixed no date for the completion of that part of it with which we are concerned in this case. It did require that the tabulation of total population by states as required for the apportionment of representatives in Congress be completed within eight months after April 1, 1950. 46 Stat. 21, 13 U.S.C. § 202. It also allowed the period of three years from January 1, 1950, for the completion of all of the reports required. 46 Stat. 21, 13 U.S.C. § 202. Nothing, however, is said in the law concerning the completion of the tabulation of population statistics by counties, towns or wards. The provisions of the law which are relevant to the determination when the census was completed by the publication of the final figures as to population are only two in number. Section 18 (46 Stat. 25, 13 U.S.C. § 218) authorizes the director of the census to furnish any governor with certified copies of so much of the population returns or transcripts thereof as may be requested. Section 13 (46 Stat. 25, 13 U.S.C. § 213) authorizes him to have printed preliminary and other census bulletins and final reports of the several investigations authorized by the law. There is no time limited for such publications.

It is stipulated that the governor of Connecticut could have obtained from the director of the census certified copies of returns showing the population in this state at any time after the end of October, 1950. If it is assumed that had he received that information it would have been such an official publication as would have been a completion of the census under

the thirty-first amendment, the fact is that he did not make the request and that consequently there was no official publication made in that way prior to the opening of the 1951 session of the General Assembly.

There were only four official bulletins published by the director. The first was the bulletin of August 18, 1950. That was merely a preliminary bulletin which expressly disavowed all claim that the final computations would not change the result. Moreover, it did not contain figures broken down into population by wards. Even if it had been final, therefore, it was not adequate to provide a basis for redistricting. For those reasons it was not the completion of the census. The second bulletin was the one released as of November 5, 1950. Although the figures contained in this were stated to be final, they were not broken down into any subdivisions of any states. It cannot well be claimed that this bulletin constituted the completion of the census.

The third bulletin, dated August 12, 1951, contained final figures by states, counties and towns but not by wards. It, therefore, would not meet the requirement of an official publication of the results of the enumeration which would be the completion of the census under the thirty-first amendment. It was not until the fourth bulletin was published on November 28, 1951, that there was an official record open to the public at large which met all of the requirements. It was, therefore, this publication which marked the completion of the seventeenth census as contemplated by the thirty-first amendment. Consequently, the completion of the census postdated the convening of the 1951 session of the General Assembly, and the 1953 session was the one "next after the completion of [the] census."

In determining the question whether the thirty-first amendment precludes a redistricting at any session of the General Assembly other than the one immediately following the completion of a census, it must also be borne in mind that the constitution must be interpreted in such a way as to support the validity of a legislative enactment if such an interpretation is reasonably possible.

So far as I am able to ascertain, it is uniformly held in other jurisdictions that, where the constitution imposes a duty on the legislature, at its session next after a census, to redistrict or reapportion the state for election purposes, there is a continuing duty, and, if the first session fails to enact a valid redistricting act, the duty devolves on succeeding legislatures until it is performed. *Opinion of the Justices,* 254 Ala. 185, 186, 47 So. 2d 714; *In re Legislative Apportionment,* 12 Colo. 186, 21 P. 480; *Fergus* v. *Kinney,* 333 Ill. 437, 440, 164 N.E. 665; *State ex rel. Meighen* v. *Weatherill,* 125 Minn. 336, 340, 147 N.W. 105; *State ex rel. Gordon* v. *Becker,* 329 Mo. 1053, 1061, 49 S.W.2d 146; *Botti* v. *Mc-Govern,* 97 N.J.L. 353, 356, 118 A. 107; *People ex rel. Carter* v. *Rice,* 135 N.Y. 473, 490, 31 N.E. 921; *Matter of Reynolds,* 202 N.Y. 430, 444, 96 N.E. 87, 416; *Jones* v. *Freeman,* 193 Okla. 554, 563, 146 P.2d 564; *Opinion of the Judges,* 61 S.D. 107, 110, 246 N.W. 295; *State ex rel. Attorney General* v. *Cunningham,* 81 Wis. 440, 51 N.W. 724; 18 Am. Jur. 190, § 14.

The reasoning upon which the foregoing authorities rest is well stated in *People ex rel. Carter* v. *Rice,* supra, 491: "It cannot be tolerated that a legislature, by a mere omission to perform its constitutional duty at a particular session, could thereby prevent for another ten years the apportionment

provided for by the Constitution." In *Botti* v. *Mc-Govern,* supra, the New Jersey court puts it forcibly (p. 356): "In our opinion, the right of the inhabitants of the several counties of the state to be accorded the representation in the lower house, provided by the constitution, cannot be defeated by such non-action of the legislature."

The only case coming to my attention which takes a contrary view is *Opinion of the Justices,* 18 Me. 458. In that case, decided in 1842, two of the three justices expressed the opinion that, if the session of the legislature designated by the constitution failed to act, the following session had no power. The third justice disagreed. The plaintiffs have cited *Noecker* v. *Woods,* 259 Pa. 160, 164, 102 A. 507, and *Rumsey* v. *People,* 19 N.Y. 41, 54. The constitutional provision involved in these cases, however, related to the redistricting of judicial districts rather than election districts. This difference is a real one. The redistricting of judicial districts affects only the determination where cases shall be tried. It deprives no litigant of any substantive right. The omission to reapportion senatorial districts in accordance with changes in population, on the other hand, affects the right of each voter to have proportionate representation in the legislature.

It is true that most of the constitutional provisions involved in the cases cited differ from those contained in the thirty-first amendment to the Connecticut constitution. In most instances they go no further than to direct that the session of the legislature next after the taking of a census shall reapportion the state. They do not expressly limit the power to that session. In *Opinion of the Judges,* 61 S.D. 107, 111, 246 N.W. 295, however, it appears that the constitution of South Dakota, in addition to di-

recting that the reapportionment be made at the session next after a census, specified expressly "but at no other time." The court said with reference to that difference (p. 111): "That is to say, in most of the comparable constitutional provisions there is affirmative mandate for action at a certain specified time but no express prohibition of action at other times. We do not, however, regard that fact as particularly material. It seems to be held by all the courts which have had occasion to pass upon the matter that an affirmative mandate for legislative action at a specific time is an implied prohibition of action at any other time."

With this background of interpretation of comparable constitutional provisions in other states, I turn now to a consideration of the proper construction to be given the thirty-first amendment to our own constitution. It is clear, in the light of the authorities cited, that, if the amendment imposes on the session of the General Assembly next after a census any duty with reference to redistricting the state and that session has failed to perform that duty, it is a continuing duty to be fulfilled by the next session unless it is prohibited by the amendment. The first inquiry, therefore, is what, if any, duty is imposed upon the session of the General Assembly next after the completion of the census.

There is no question that the first session of the General Assembly after the completion of a census is given the power to alter the senatorial districts, "if found necessary to preserve a proper equality of population in each district." Although this power is not expressly granted to any session after that of 1911, there can be no doubt that the intendment of the amendment is that each session next after each succeeding census shall have the power.

Under the constitution of 1818, the state senators were elected at large. Conn. Const. Art. III §§ 4, 5 (1818). The dominant purpose of the thirty-first amendment and of its prototype, the second amendment, was to provide representation in the senate in proportion to the population. The principle of such proportionate representation has become fundamental in our form of government. It was obviously contemplated by the framers of both amendments that changes in the population of the various districts would require changes from time to time in the district boundaries if the fundamental principle of representation in proportion to population was going to be maintained. The grant of a power is often the equivalent of the imposition of a duty to exercise that power. In view of the fact that the exercise of the power granted to the General Assembly in this matter is so essential to the maintenance of the fundamental principle of government embodied in the amendments, I can come to no other conclusion than that it is the intent of the amendments to impose upon the General Assembly the duty to exercise the power. *State ex rel. Meighen* v. *Weatherill,* 125 Minn. 336, 339, 147 N.W. 105; see *Jones* v. *Commissioners,* 137 N.C. 579, 590, 50 S.E. 291; *Palmcroft Development Co.* v. *Phoenix,* 46 Ariz. 200, 205, 49 P.2d 626. It is to be noted that the duty is not necessarily to accomplish a redistricting at any given session but rather to determine at the session next after the completion of each United States census whether a redistricting is "necessary to preserve a proper equality of population in each district."

After imposing a duty on the General Assembly to determine from time to time the need for redistricting, the amendment goes on to provide that,

after 1911, "said districts shall not be altered, nor the number of senators altered, except at a session of the general assembly next after the completion of a census of the United States." It is essential to determine the intent expressed in this clause. Obviously, the only purpose of its injection into the amendment was to preserve a certain stabilization of the districts to the end that they could not be frequently changed for partisan political advantage. The first session of the legislature after the completion of a census has the advantage of being in possession of fresh population figures, and for that reason it is desirable that the redistricting be accomplished by that session. Aside from that consideration, however, there could be no reason to anticipate that the first session would make a more equitable apportionment than any subsequent session.

It is of some significance that changes are not limited to the sessions next after a census but to "a" session next after a census. If it is kept in mind that the main purpose of the amendment was to establish the principle of proportionate representation in the senate and to continue that principle in operation through changes in population, the intendment of the clause in question is apparent. It is that the duty to consider redistricting shall be performed by the General Assembly not oftener than once after each United States census. Reading the amendment as a whole, therefore, it means this: It is the duty of the first session of the General Assembly after the completion of a United States census to determine whether it is necessary to alter the senatorial districts in order to preserve a proper equality of population among the districts. If the first session after any census fails to perform that obliga-

tion, then the duty devolves upon succeeding sessions until it is performed, provided, however, that when it has once been performed after any given census it may not be undertaken again until another census has been completed. This interpretation accords with common sense and is in line with the overwhelming weight of authorities in other jurisdictions.

It is stipulated that the General Assembly of 1951 took no action with respect to altering the state senatorial districts and that no bill for that purpose was introduced in either house. The plaintiffs seek to modify that fact by pointing out (1) that the governor recommended such action, (2) that the attorney general advised the governor that it was competent for the 1951 session to revise the districts, and (3) that the house of representatives of that session proposed certain amendments to the constitution relating to the subject of senatorial redistricting. Action by either the governor or the attorney general can hardly be considered action by the General Assembly. The first of the constitutional amendments proposed was the one the purpose of which was to revise the entire constitution by incorporating the provisions of the forty-seven amendments into the body of the constitution. By this proposal the thirty-first amendment was treated in the same manner as all the others. The other proposal was for an amendment of the thirty-first amendment itself. Neither of these proposals could fairly be interpreted as a consideration by the house of representatives of the redistricting of the state at that time. The further contention of the plaintiffs that the nonaction of the General Assembly in 1951 was the equivalent of a determination by it that no redistricting was necessary at that

time is an unrealistic appraisal of the situation.

I, therefore, conclude that if the seventeenth United States census had been completed before the convening of the 1951 General Assembly, the result of the failure of that session to consider the question whether a redistricting was necessary would have been that the duty of considering the question would continue to the 1953 session.

BALDWIN, J. (dissenting). I cannot concur with my brethren in the majority opinion. The rule has been often stated that a court should approach the question of the constitutionality of an act of the legislature with great caution, make every presumption and intendment in its favor and sustain it unless its invalidity is clear. *Northeastern Gas Transmission Co.* v. *Collins,* 138 Conn. 582, 586, 87 A.2d 139. It is the duty of the courts to reconcile legislative enactments with the constitution, if that can be done logically and reasonably, for it must be presumed that the legislature, in enacting a law, intended that it should be valid. *DeMond* v. *Liquor Control Commission,* 129 Conn. 642, 645, 30 A.2d 547; *Connecticut Light & Power Co.* v. *Southbury,* 95 Conn. 242, 247, 111 A. 363. This means simply that we should find, if possible, a reasonable, logical way by which the act of the legislature under attack can be brought within constitutional limitations.

The vital question is whether the seventeenth census was completed, within the meaning of the thirty-first amendment, before the opening of the 1951 session of the General Assembly. The taking of a census is a prodigious task. The statute prescribes a three-year period beginning on January 1 of the first year of each decennium starting in 1930, which it defines as the "decennial census period," as the time

within which the census shall be completed. 46 Stat.
21, 13 U.S.C. § 202. It authorizes the director of the
census to publish the census bulletins and reports.
46 Stat. 25, 13 U.S.C. § 213. The plaintiffs, in their
argument, and the majority opinion, in sustaining
that argument, point out that there was available to
the governor and members of the General Assembly,
before the convening of the 1951 session on January
3, 1951, an enumeration of the population of Con-
necticut broken down into cities, towns, wards and
voting districts which would have furnished an ade-
quate basis upon which to rearrange the senatorial
districts of the state. This material was obtainable
from the census bureau upon request by certain in-
dividuals and upon the payment of a fee. That all
may be so, but it does not follow that the census was
completed, within the meaning of the thirty-first
amendment, so as to require action by the General
Assembly upon such available data. We are not
concerned with whether an enumeration of the popu-
lation had been finished or the census sufficiently
completed so that information concerning it could
have been obtained from the census bureau in Wash-
ington. The language of the amendment is precise.
It requires that any redistricting be done "after the
completion of a census of the United States."
The framers of the amendment obviously in-
tended that there be some definite time readily
ascertainable after which the legislature should
act. No better time could have been chosen than
the date when the final and complete figures for
Connecticut were officially published by the census
bureau, as was done on November 28, 1951. Thence-
forth everybody could know what the population
figures were, by city, town, borough, ward and vot-
ing district. Not until this official publication could

it be truly said that the census was completed.

We are construing the provisions of a constitution. Our duty is to construe them, if reason and logic permit, so that they will be understandable and workable in the future. Therefore we should find, if we can, that the words "completion of a census" refer to some act or date, fixed and certain and readily determinable, when the census is officially complete and available to all. In a matter that affects the voting rights of the voters of the whole state, it is essential that the members of the General Assembly should know with certainty when the census is complete. It is only just that the people should have the data upon which their legislature acts. The majority opinion leaves this date or act entirely in the air. It completely fails to make either definite. If a census is complete when sufficient data are available, who is to say just when that time is or whether it is before or after the date for the convening of a General Assembly? There could well be a divergence of opinion which could confound any legislator. At best, that time would depend upon the whim or caprice of an official in the census bureau. On the other hand, the publication of the final figures for Connecticut, as authorized and required by law, is a definite and final act marking the completion of the census. The day of publication is a definite and final date. It is known to the legislators and all officialdom and the people as well. Thereafter there can be no question about the completion of the census and the time when it was completed.

The majority opinion points to the fact that every act changing the limits of senatorial districts has been enacted in the year immediately following the year of the decennial census. It argues further that down through the years governors and others have

pointed out that the session immediately following the year in which the census is taken is the only one in which the legislature can act. All this could be so and yet have been based upon an assumption that a census had been completed. It does not necessarily follow that the census actually had been completed within the intendment of the thirty-first amendment. The fact is that the precise question which we have to decide in this case has never been raised before. This is the first time that this court has been called upon to determine what the language "the completion of a census" means as it is used in the thirty-first amendment. The whole case turns upon this phrase. If we hold that it means that the census is complete within the intendment of the thirty-first amendment when the population figures for Connecticut are finally and officially published and so made available to all, we arrive at a logical, reasonable result which avoids all confusion and uncertainty for the future and disposes of the case at bar.

Assuming that the census was completed before the convening of the 1951 session of the General Assembly, the majority opinion goes on to construe the amendment to mean that, since the 1951 session failed to redistrict the state, redistricting cannot again be considered until 1961. If that is the case, one branch of the legislature, by refusing to act at a session following the completion of the census, can postpone a needed redistricting for ten years. Concededly, there is a wide and unjust disparity in population among the senatorial districts as now established. Some have as many as four times the population of others. Since the senate is that branch of the legislature in which the people are supposed to be represented on the basis of equality in population in the districts, the public welfare requires that this

discrepancy be remedied. That is the controlling purpose of the amendment. The General Assembly is given the power to alter the districts "if found necessary to preserve a proper equality of population in each district." This is tantamount to stating that when there is so obvious a discrepancy as presently exists the legislature is under a duty to exercise that power. Courts are bound to construe a provision of a constitution so that it will accomplish the purpose intended. *Palka* v. *Walker,* 124 Conn. 121, 127, 198 A. 265; see *West Hartford* v. *Thomas D. Faulkner Co.,* 126 Conn. 206, 211, 10 A.2d 592; *People's Holding Co.* v. *Bray,* 118 Conn. 568, 571, 173 A. 233.

It is not necessary to repeat here the citation of cases in the majority and dissenting opinions which hold that, if the legislature next after a census fails to act, a succeeding legislature may do so. True, those cases do not concern constitutional provisions identical with our own. They do deal, however, with constitutional provisions which are obviously designed to accomplish the same purpose, that is, a redistricting once every ten years. This is brought about by a constitutional requirement that the legislature at a session "next following" or "first convened" after a decennial census shall do such redistricting as the situation may require. Legislatures have broad powers, and if one session fails to take action which is obviously necessary it is going a long way to hold that no subsequent meeting of the legislature can perform the function. While the main purpose of the thirty-first amendment, and of the constitutional provisions discussed in the cases, was to require one redistricting every ten years to preserve equality of representation, it was also their purpose to avoid more than one. In fortifying the

claim that only a session of the legislature immediately following a census can act and that no session thereafter can act until after another census, the majority lay great stress upon the words in the amendment that the districts, when established, "shall not be altered . . . except at a session of the general assembly next after the completion of a census." This means, read as it must be with the entire sentence in which the language is contained, that when there has been a redistricting in one decennium there shall not be another until another census has been completed. The prohibition becomes operative only when the legislature has acted to redistrict and not when it has failed to do so.

The dissenting opinion of the chief justice produces a reasonable and workable construction of the amendment and one to which I subscribe.